ACCEPTED
05-14-01175-CR
FIFTH COURT OF APPEALS
DALLAS, TEXAS
3/18/2015 10:57:08 AM
LISA MATZ
CLERK

## No. 05-14-01175-CR

**IN THE COURT OF APPEALS
FOR THE FIFTH DISTRICT OF TEXAS
AT DALLAS**

RECEIVED IN
5th COURT OF APPEALS
DALLAS, TEXAS
3/18/2015 10:57:08 AM
LISA MATZ
Clerk

## CHRISTOPHER GERALD PRICE,
**Appellant**

**v.**

## THE STATE OF TEXAS,
**Appellee**

*On appeal from Criminal District Court No. 3
of Dallas County, Texas
In Cause No. F13-58588-J*

## BRIEF FOR APPELLANT

*Counsel of Record*

**Lynn Richardson
Chief Public Defender
Dallas County, Texas**

**Katherine A. Drew
Assistant Public Defender
State Bar No. 06117800**

**Frank Crowley Courts Building
133 N. Riverfront Boulevard, LB-2
Dallas, Texas 75207-4399
(214) 875-2360 (phone)
(214) 875-2363 (fax)
Kathi.Drew@dallascounty.org**

*Attorneys for Appellant*

# LIST OF PARTIES

**APPELLANT**
Christopher Gerald Price

**APPELLEE**
The State of Texas

**DEFENSE COUNSEL AT TRIAL**
Edwin V. King
400 S. Zang Blvd, Suite 105, LB 43
Dallas, TX 75208

**STATE'S ATTORNEY AT TRIAL**
Kendall Costello and Cresta Garland
Dallas County District Attorney's Office
133 N. Riverfront Blvd., LB-19
Dallas, Texas 75207-4399

**APPELLANT'S ATTORNEY ON APPEAL**
Katherine A. Drew
Dallas County Public Defender's Office
Frank Crowley Courts Building
133 N. Riverfront Blvd., LB-2
Dallas, Texas 75207-4399

**STATE'S ATTORNEY ON APPEAL**
Susan Hawk (or her designated representative)
Dallas County District Attorney's Office
Frank Crowley Courts Building
133 N. Riverfront Blvd., LB-19
Dallas, Texas 75207-4399

# TABLE OF CONTENTS

LIST OF PARTIES ................................................................................................ ii

INDEX OF AUTHORITIES................................................................................v

STATEMENT OF THE CASE.............................................................................1

ISSUES PRESENTED.........................................................................................1

STATEMENT OF FACTS ...................................................................................2

SUMMARY OF ARGUMENT ..........................................................................16

ARGUMENT ......................................................................................................17

Point of Error 1, Restated.................................................................................17

*The trial court abused its discretion by limiting defense counsel's cross-examination of the complainant. (RR4: 103-105; RR5: 109)..............*17

Point of Error 2, Restated.................................................................................17

*The trial court abused its discretion by denying defense counsel's request to re-open for the purpose of additional cross-examination of the complainant. (RR6: 6).* ...................................................................................17

Point of Error 3, Restated.................................................................................17

*The trial court abused its discretion by sustaining the State's objection to defense counsel's jury argument regarding the complainant's lack of honesty to law enforcement and instructing the jury to disregard that argument. (RR6: 42-53).* ...........................................17

Point of Error 4, Restated.................................................................................36

*The trial court erroneously included the full definition of intent in the jury charge. (CR1: 92)*..............................................................................36

Point of Error 5, Restated.................................................................................36

*The trial court erroneously included the full definition of knowledge in the jury charge. (CR1: 92).*................................................................................36

Point of Error 6, Restated.................................................................................42

*The trial court erroneously included the full definition of reckless in the jury charge. (CR1: 92).*................................................................................42

PRAYER ............................................................................................................44

CERTIFICATE OF SERVICE ..................................................................44

CERTIFICATE OF COMPLIANCE .........................................................45

# INDEX OF AUTHORITIES

**Cases**

*Almanza v. State*,
    686 S.W.2d 157 (Tex. Crim. App. 1985) .................................................. 39, 40, 42

*Billodeau v. State*,
    277 S.W.3d 34 (Tex. Crim. App. 2009) ......................................................... 18, 19

*Brooks v. State*,
    967 S.W.2d 946 (Tex. App. – Austin 1998, no pet.) ...........................................38

*Carroll v. State,*
    916 S.W.2d 494 (Tex. Crim. App. 1996)...........................................................32

*Chaney v. State*,
    314 S.W. 3d 561 (Tex. App. – Amarillo 2010, pet. ref'd)............................ 39, 43

*Clark v. State,*
    365 S.W.3d 333 (Tex. Crim. App. 2012) ...........................................................37

*Cook v. State,*
    884 S.W.2d 485 (Tex. Crim. App. 1994)............................................................38

*Davis v. Alaska*,
    415 U.S. 308 (1974) ............................................................................................32

*Davis v. State*,
    329 S.W.3d 798 (Tex. Crim. App. 2010) ...........................................................19

*Delaware v. Van Arsdall*,
    475 U.S. 673 (1986) ............................................................................................32

*Hammer v. State*,
    296 S.W.3d 555 (Tex. Crim. App. 2009)................................................ 32, 33, 34

*Landrian v. State*,
    268 S.W.3d 532 (Tex. Crim. App. 2008) ...........................................................38

*Martinez v. State*,
    327 S.W.3d 727 (Tex. Crim. App. 2010) ...........................................................18

*Mendenhall v. State*,
    15 S.W.3d 560 (Tex. App. – Waco 2000), *aff'd on other grounds*, 77 S.W.3d 815
    (Tex. Crim. App. 2002) .......................................................................................38

*Peek v. State,*
   106 S.W.3d 72 (Tex. Crim. App. 2003) ................................................................18

*Vallair v. State*,
   No. 09-11-00038-CR, 2011 Tex. App. LEXIS 7055 at * 8 (Tex. App. –
   Beaumont August 31, 2011 pet. ref'd) (not designated for publication) .............43

**Statutes**

TEX. CODE CRIM. PROC. art. 36.02 ........................................................................18

TEX. CODE CRIM. PROC. art. 36.19 ........................................................................40

TEX. FAM. CODE § 261.201 ..................................................................................19

TEX. PENAL CODE § 22.02 ......................................................................................1

TEX. PENAL CODE § 22.02(a)(1) ...........................................................................38

TEX. PENAL CODE § 6.03(a) ..................................................................................38

TEX. PENAL CODE § 6.03(b) ..................................................................................38

TEX. PENAL CODE § 6.03(c) ..................................................................................43

**Rules**

TEX. R. EVID. 404(a)(3) .......................................................................................32

TEX. R. EVID. 404(b) ...........................................................................................33

TEX. R. EVID. 608(b) .......................................................................................29, 33

TEX. R. EVID. 613(b) .......................................................................................33, 36

**Constitutional Provisions**

TEX. CONST. Art. I § 10 .......................................................................................32

U.S. CONST. amend. VI ........................................................................................32

U.S. CONST. amend. XIV ......................................................................................32

**TO THE HONORABLE COURT OF APPEALS:**

COMES NOW Appellant, Christopher Gerald Price, and submits this brief on appeal from a conviction for aggravated assault in Criminal District Court No. 3 of Dallas County, Texas, the Honorable Gracie Lewis, judge presiding.

## STATEMENT OF THE CASE

Appellant was charged by indictment with aggravated assault in violation of TEX. PENAL CODE § 22.02. (CR1: 15). Appellant entered a plea of not guilty to this indictment and was afforded a trial before a jury. (RR4: 16). At the conclusion of the evidence, the jury found Appellant guilty and subsequently sentenced him to seventy-five years' imprisonment. (CR1: 119; RR6: 56; RR7: 41). Based on the jury's verdict, the trial court also made a family violence finding and a deadly weapon finding in the judgment. (CR1: 100, 120; RR6: 56).

Judgment was entered on September 8, 2014. (CR1: 119). Appellant gave timely notice of appeal. (CR1: 119).

## ISSUES PRESENTED

### Point of Error 1

***The trial court abused its discretion by limiting defense counsel's cross-examination of the complainant. (RR4: 103-105; RR5: 109).***

1

**Point of Error 2**

*The trial court abused its discretion by denying defense counsel's request to re-open for the purpose of additional cross-examination of the complainant.*
*(RR6: 6).*

**Point of Error 3**

*The trial court abused its discretion by sustaining the State's objection to defense counsel's jury argument regarding the complainant's lack of honesty to law enforcement and instructing the jury to disregard that argument. (RR6: 42-53).*

**Point of Error 4**

*The trial court erroneously included the full definition of intent in the jury charge. (CR1: 92).*

**Point of Error 5**

*The trial court erroneously included the full definition of knowledge in the jury charge. (CR1: 92).*

**Point of Error 6**

*The trial court erroneously included the full definition of reckless in the jury charge. (CR1: 92).*

## STATEMENT OF FACTS

**Leslie Warren**

Leslie Warren, the complainant, testified that she had known Appellant for ten years. (RR4: 25). For a six month period of time in 2011-2012, Appellant had lived with her, her common law husband, Scott Segalla, and their children. (RR4: 27). They began a romantic, dating relationship after Warren broke up with Segalla

and Appellant again moved in with Warren in January of 2013.[1] (RR4: 27, 28, 87, 88).

Warren had been a drug user for many years and had a "very significant drug history." (RR4: 31, 90). Specifically, she smoked methamphetamine and marijuana. (RR4: 31). Warren suspected that Appellant was using drugs as he would not take a drug test. (RR4: 32). After several months, Warren began openly using drugs again. (RR4: 32, 33, 34). She got her supply of drugs from some of her customers at Keller's Hamburgers, where she worked as a car hop. (RR4: 29, 33). In the months leading up to the events for which Appellant was on trial, Warren's life consisted of "working at Keller's and staying up late at night drinking and smoking ice, which is methamphetamine," and marijuana. (RR4: 91). Essentially, everyone she associated with was using illegal drugs. (RR4: 90).

On July 29-30, 2013, Veronica Muniz and Candace Smith were at Warren's apartment "hanging out" and smoking methamphetamine.[2] (RR4: 36, 37). At one point, Warren drove Muniz to a motel to meet a friend. (RR4: 37, 38). Appellant and Smith followed them. (RR4: 38). According to Warren, Appellant was acting

---

[1] Warren admitted, on cross-examination, that her children didn't really live with her but stayed with other family members. (RR4: 91, 92).

[2] Indeed, Warren admitted that she had been smoking methamphetamine for two-three days before the events occurred which led to the prosecution. (RR4: 108). She had also been sleepless for an extended period of time, at least twenty-four hours. (RR4: 109).

jealous; he knew Muniz was a lesbian and kept asking if she was Warren's girlfriend. (RR4: 38, 39). They stayed for a while, and then returned to Warren's apartment with Smith, who stopped to get them something to eat. (RR4: 39, 40). Warren and Appellant argued a bit, but they got over it.[3] (RR4: 40).

An argument between Warren and Appellant started again when Appellant's friend, Chivo, came over to sell them $60 worth of methamphetamine. (RR4: 40, 41, 42, 112). Smith had wanted to buy some drugs from Chivo. (RR4: 112). Chivo apparently said something to Smith that upset her.[4] (RR4: 42, 43, 112). Appellant initially agreed with Warren, but then called Smith a bitch, which further upset Warren. (RR4: 43, 44). Both Chivo and Smith left. (RR4: 45, 112, 113). Warren and Appellant continued to argue, primarily over why he would bring a drug dealer into their home, but then they had "make-up sex." (RR4: 45, 46, 113-114).

After engaging in sex, Warren and Appellant continued to argue, both over Chivo and Appellant's ex-girlfriend. (RR4: 46, 47). Both Warren and Appellant were paranoid from drug use at this point and the argument was becoming volatile. (RR4: 47, 48, *see also* RR4: 108).

---

[3] Warren stated on cross-examination that she and Appellant had been "arguing for months." (RR4: 115). She admitted that they argued more when they were high than when they were sober. (RR4: 115).

[4] Warren testified that she knew Chivo was trying to have sex with Smith. (RR4: 113).

4

Appellant told Warren to go into the bathroom and basically pushed her into the master bath. (RR4: 49, 118). Warren testified that she was begging Appellant to talk to her. (RR4: 49, 50). She sat on the floor between the toilet and the tub. (RR4: 50, 118). Appellant left the bathroom; Warren heard him going through her purse and drawers in the household furniture. (RR4: 50). Appellant was saying "a lot of hateful things." (RR4: 50). Even though the door to the bathroom was not locked, Warren testified that she was being held in the bathroom against her will.[5] (RR4: 51, 53).

Appellant came back into the bathroom about 20 minutes later. (RR4: 51). According to Warren, he tried to shove a shirt into her mouth so that she would shut up and stop calling his name. (RR4: 51). He also brought in a bottle of rubbing alcohol, which he poured over her head. (RR4: 51, 118, 120). He lit something with a lighter, which she thought was toilet paper, and threw it on her head. (RR4: 51, 52). Warren heard a "poof" and put her head under the faucet in the tub. (RR4: 51, 52, 123, 126). Appellant was yelling "stop putting it out, don't touch it." (RR4: 52).

While Warren was washing her hair, globs of it were coming out. (RR4: 52).

_____

[5] Interestingly, Warren also admitted that she did not lock the bathroom door herself to keep Appellant out of the bathroom, even after he poured alcohol on her head. (RR4: 53, 119, 122). Evidence was heard that the bathroom door only locked from the inside. (RR4: 119, 122, 124).

She was crying and yelling at Appellant. (RR4: 52). Appellant left, but again returned and tried to gag Warren with a shirt. (RR4: 54). He then got an extension cord and bound her wrists together and then tied her wrists to her ankles. (RR4: 54, 55). Warren was very scared at this point. (RR4: 55).

Warren managed to free her hands from the extension cord. (RR4: 56). Appellant then re-entered the bathroom and poured charcoal lighter fluid[6] on her. (RR4: 56, 125). Warren jumped in the shower and tried to rinse the fluid off. (RR4: 56, 126, 132). She took off her clothes,[7] except for her bra and panties, and wrapped herself in the shower curtain. (RR4: 56, 57, 78, 137). She then took the shower rod and pushed Appellant out of the bathroom. (RR4: 57, 78, 134).

Warren ran to the master bedroom for a blanket while Appellant continued to squirt the charcoal lighter fluid on her as well as around the bedroom. (RR4: 57, 134). Warren was saying a number of things to Appellant, such as she loved him, she was pregnant,[8] and that she could not believe he was doing this to her. (RR4: 57). Appellant got another piece of toilet paper, lit it, threw it on the bed, and the

---

[6] Warren testified that this charcoal lighter fluid was hers and was usually kept in the kitchen, though Appellant may have gotten it from the patio. (RR4: 78, 79).

[7] Warren testified that she knew if her clothes caught fire they would stick to her. (RR4: 56, 57).

[8] It later turned out that Warren was, in fact, pregnant with Appellant's child, though she actually did not know it at the time. (RR4: 85, 86, 140-141).

bed went up in flames. (RR4: 57, 87, 134). Appellant did not throw the tissue at Warren. (RR4: 138). Warren jumped or catapulted over the bed and into Appellant's arms. (RR4: 57, 135, 137). Appellant gave her a bear hug, then hit her on the back of her head; she felt a big "crack." (RR4: 57, 58, 60, 72-73, 135, 137).

Warren lost consciousness and woke up in the hallway of her apartment. (RR4: 60, 61, 73). She walked outside where she saw a friend, "Rob."[9] (RR4: 60, 137, 139). Rob asked if her kids were in the apartment. (RR4: 62). When told they were not, Rob called 911. (RR4: 63). He placed Warren in his truck then got other tenants out of the building. (RR4: 63). When the paramedics arrived, she told them that her boyfriend did it. (RR4: 65).

Warren ultimately spent 24 days in the hospital being treated for burns. (RR4: 67, 86). She was in a lot of pain and was given medication for it. (RR4: 66, 75). The majority of injuries were to her back, though she also had injuries to her neck, ears, head and hands. (RR4: 68; State's Exhibit 2-20). She underwent skin graft surgery and had multiple follow-up appointments since her release from the hospital. (RR4: 79, 80, 81). She lost everything in the fire and was essentially homeless at the time of trial, sporadically staying with various friends and family members. (RR4: 68, 69, 84).

---

[9] Warren testified that she had talked to Rob on the telephone just after she and Appellant had sex; Rob wanted to switch cars with her, to which she had agreed. (RR4: 62, 117).

Warren admitted that the sequence of events she recounted to the police was different from that of her trial testimony. (RR4: 120, 121, 125, 127-128, 129; Defense Exhibit1). She also stated that there were inaccuracies in her description of events in her medical records. (RR4: 135-136, 138). Indeed, Warren's statement to the police was as follows:

> I, Leslie Warren, 1-8-84, gave Captain Lawrence Pitman consent to sign -- to write my statement. I live at 10950 Walnut Hill Lane, Number 104W. I've been dating Christopher Price, (12-3-84), since January 12, 2013. The last couple of days, we have been arguing.
>
> On this morning, 7/30/13, we had been arguing since about 4:00 a.m. He flipped on me, tied me up with an extension cord, comma, poured alcohol me – on me, and locked me in the bathroom for a while.
>
> He threw a tissue on me that was on fire. I put the fire out using the shower. I was tied at the ankles and the wrists. I was able to untie myself. He was threatening to kill me the entire time, saying you're dumb, man, you're fixin' to be dead.
>
> You're a dumb ass, and you're fixing to be dead. He said you're fixing to burn up. I had to get loose. I grabbed the curtain rod to hit him, but I was afraid. I got out of the bathroom. He had lighter fluid. He had hit me in the head with his fist several times.
>
> I was able to get out of the bathroom. I was in the bedroom. He had poured lighter fluid on me. It was all over the bed, too. He poured it on me. I jumped on the bed to try to get away. He started throwing tissues lit on fire onto the bed. I had taken off my clothes, grabbed a blanket to protect me.
>
> I do not remember anything after that. He used a lighter to set the tissues on fire.

(Defense Exhibit 1;[10] *see also* RR4: 127-128). Yet another statement differs even more:

> My boyfriend, Christopher Price, and I got into an argument. He became upset and enraged, began punching me in the face and body. He threw me down into the bathroom and tied my wrists and ankles with an extension cord.
>
> He poured rubbing alcohol on me and then lit tissue on fire and threw it on me, lighting me on fire. He went into bedroom and got lighter fluid while I tried to put the fires out and turn on water to put myself out.
>
> I tried to run out and escape, but he was blocking my path. He squirted lighter fluid on me as I tried to get around him on the bed and lit me on fire again. I ran back into the bedroom again and hid for a bit.
>
> Then there was a lot of smoke, so I got scared and tried to run out again. I ran past a lot of fire and flames as the bed and apartment were on fire. I guess he had already left me there because he was not around anymore. A few minutes later the fire department found me and took care of me.

(Defense Exhibit 4;[11] *see also* RR5: 127-128).

### Candeace Smith

Candeace Smith had known Leslie Warren for about a year; the two met at

---

[10] Detective Pitman, who apparently took this statement, did not testify at trial.

[11] Dallas Police Officer Tom Clayton testified that he was dispatched to Parkland Hospital on July 30, 2013 to take a statement from Leslie Warren. (RR5: 122, 123). He wrote the statement out for her, which she signed. (RR5: 123, 124). The statement was admitted as Defense Exhibits 4 and 5. (RR5: 124, 127-129).

Keller's Hamburgers, where they had both worked. (RR4: 143). Smith knew Appellant as "Sour." (RR4: 144).

On July 29, Smith went to the apartment Warren and Appellant shared. (RR4: 144, 145). She had brought Warren some things from Ross, a store where she had been shopping. (RR4: 144). At one point they were joined by Veronica Muniz, a/k/a Ronnie. (RR4: 145). They all smoked methamphetamine. (RR4: 146).

At one point the four left to go see friends at a motel. (RR4: 145). Smith and Muniz both rode together in Smith's car when Warren and Appellant drove in their truck. (RR4: 146, 164-65). At the motel, everyone used methamphetamine and some people were drinking, though Smith claimed she was not one of them. (RR4: 166). Appellant became upset by Warren's attention to Muniz. (RR4: 147, 148). He was jealous of their relationship, which he thought might be sexual in nature. (RR4: 147, 167). Smith testified that the tension between the two was such that one "could cut it with a knife." (RR4: 148). Appellant was "very rude" and "territorial" of Warren. (RR4: 167).

The three left about 2:00 a.m., returning to Warren's apartment. (RR4: 148, 149). Once again Warren and Appellant rode together while Smith drove herself, stopping to get some food from Jack-in-the- Box. (RR4: 149).

Once back at the apartment, a man known as "Chivo" showed up. (RR4: 150). He brought methamphetamine, which they all smoked. (RR4: 151). Chivo

said some things to Smith which intimidated her. (RR4: 152). Appellant and Chivo's behavior towards Smith made her feel unsafe and uncomfortable. (RR4: 153, 169). This caused Warren to become mad at Appellant, which only increased Appellant's anger to Warren. (RR4: 153).

Smith left the apartment and went outside to her car, though she did not leave immediately. (RR4: 154, 179). Chivo, Appellant and Warren all came out to talk to her. (RR4: 154). Appellant yelled at Warren, though Warren did not seem worried. (RR4: 154, 155). Both Chivo and Appellant were trying to get her to come back into the apartment, which she refused to do. (RR4: 155, 174).

Smith drove off about 7:30 a.m.[12] (RR4: 156). Forty-five minutes to an hour later she got a text from Warren asking if she was OK. (RR4: 156). Smith did not respond to that text. (RR4: 156). About 2:00 p.m., Smith learned from Muniz that Warren had been hospitalized. (RR4: 157).

Smith was interviewed by the fire department, even though she was not a witness to the fire being started. (RR4: 157-158, 161). She did not tell them about her drug use that night.[13] (RR4: 157-158).

---

[12] Smith told Detective Stephenson that she went to an Albertson's where she fell asleep in the parking lot with her car running for several hours. (RR5: 76).

[13] Indeed, at the time of trial Smith was still using drugs and had used drugs the night before her testimony. (RR4: 159).

## Robert Holzheuser

Robert Holzheuser, a/k/a "Rob," met Leslie Warren at Keller's Hamburgers, where he was a regular customer. (RR4: 181). Holzheuser drove a Yukon and Warren drove a pickup; they occasionally switched vehicles if he needed a pick-up in his construction business. (RR4: 182). On the morning of July 30, between 9:00 and 10:00 a.m., Holzheuser spoke to Warren and they agreed to switch vehicles later that day. (RR4: 182, 194). During the conversation, Holzheuser could hear Appellant in the background, though he could not make out what was being said. (RR4: 183). Holzheuser asked if Warren was okay; she said yes. (RR4: 183).

Holzheuser got to Warren's apartment between noon and 1:00 p.m. (RR4: 184). He parked in front of the apartment. (RR4: 184). When Holzheuser walked toward the door, Warren opened it in her bra and panties. (RR4: 185). She did not speak, but walked past Holzheuser. (RR4: 185). Holzheuser could see blood on the side of her face and noticed that Warren was blistered and her hair was smoking, though she herself was not on fire. (RR4: 185, 193). Warren was disoriented and could not tell Holzheuser if her children were in the apartment or what had happened. (RR4: 185, 186, 190).

Holzheuser checked the apartment, which was smoky. (RR4: 186). He noticed that the bed was on fire. (RR4: 186). Holzheuser left the apartment, called 911, and then warned other tenants to get out of the building. (RR4: 186). He

waited with Warren, whom he had put in his truck, until the paramedics arrived and took her to Parkland Hospital. (RR4: 185, 187, 196).

## Shane Cooper

Dallas firefighter and paramedic Shane Cooper was dispatched to the scene of a fire at 12:56 p.m. on July 30, 2013; the address was 10950 Walnut Hill Lane and the report stated that a mattress was on fire and a female was badly burned. (RR4: 201, 202, 204). Smoke was visible as he and his partner, Lorenzo Herrera, approached the complex. (RR4: 204). Cooper found the female, Warren, on the passenger side of a "citizen's Tahoe." (RR4: 204). She was wearing only her bra and her panties and had quite a bit of burning, mostly to her top shoulder area though there were other visible injuries. (RR4: 205, 206, 210). Her airway was clear and she was responsive and coherent. (RR4: 207). According to Cooper, she told him that she had been tied up by her boyfriend and left in a bathroom overnight; he then poured lighter fluid on her and set her on fire. (RR4: 210). Cooper detected the odor of some chemical, but not specifically lighter fluid. (RR4: 215, 216).

Cooper and his partner began treatment on her and transported her as quickly as they could to Parkland Hospital. (RR4: 206, 211).

**Brett Arnoldo**

Dr. Brett Arnoldo, a burn surgeon at Parkland Hospital, was responsible for some of the care Warren received. (RR5: 8-9). Arnoldo testified that Warren had burns over 15% of her body; some of these were third degree burns. (RR5: 10, 11). Her medical records reflect that she stated that her boyfriend assaulted her, poured alcohol and lighter fluids on her face and set her on fire. (RR5: 14, 15). Her injuries were consistent with being set on fire. (RR5: 19). Arnoldo operated once on Warren (RR5: 12, 13, 17-18).

Arnoldo described the treatment burn patients receive and testified that it can be very painful. (RR5: 17-23). In his opinion, Warren's injuries were not significantly life threatening for a person her age. (RR5: 24). She did, however, suffer permanent disfigurement and the possibility for life-long effects. (RR5: 24-26).

**Marcus Stephenson**

Arson Investigator Marcus Stephenson was the lead investigator of the fire in the apartment complex. (RR5: 32, 33). Stephenson testified that his investigation revealed that the fire started in the master bedroom on the bed. (RR5: 34, 56, 78). There was no evidence that the fire was started in the bathroom, or, in fact, anywhere other than the master bedroom. (RR5: 60, 61). In Stephenson's opinion, the damage to the apartment was caused by arson. (RR5: 53, 65).

A canine used in his investigation, who was trained to alert on 14 different accelerants,[14] alerted on two places in the apartment: the master bedroom and the hallway bathroom. (RR5: 50, 51, 50). Stephenson could not say what substance the dog had alerted on, but took samples from both rooms. (RR5: 51, 59; State's Exhibits 66, 67). He also collected a red lighter; the lighter was melted a bit and no fingerprints were obtained from it. (RR5: 53).

Stephenson admitted that there was no indication of a "trailer" or "fire trail" from one location to another, *i.e.*, a line of accelerant between the hallway bathroom and the master bedroom. (RR5: 71, 84, 85, 86).

In Stephenson's opinion, lighter fluid was an ignitable fluid and a lighter was an ignitable source. (RR5: 57). Both were deadly weapons. (RR5: 57).

As part of his investigation, Stephenson spoke to Candeace Smith. (RR5: 67, 75). Smith told him that Appellant and Warren had been up for a couple of days. (RR5: 75). He knew they had been "partying," but did not know that they had been smoking methamphetamine. (RR5: 76). He did not ask Smith if she had been doing drugs. (RR5: 76).

---

[14] The dog was trained to alert on "[g]asoline, kerosene, diesel fuel, automatic transmission fluid, charcoal lighter fluid, turpentine, acetone, kerosene, paint thinner, lacquer thinner, lacquer thinner, (sic) (and) paint remover." (RR5: 59). The dog was not trained to alert on rubbing alcohol. (RR5: 56, 79).

15

**Emerald Nazareno**

Emerald Nazareno, a forensic scientist with the State Marshal's arson laboratory, testified that he received and tested two gallons of fire debris.[15] (RR5: 87-90). In the first gallon which contained samples of the left bedroom carpet, he found no traces of accelerant. (RR5: 90, 93). In the second, which contained debris from a hallway bathroom rug, he found MPD, medium petroleum distillate. (RR5: 90, 93). Since there were an infinite number of substances that would qualify, he was unable to say with certainty exactly what the MPD was. (RR5: 93, 96, 97). He did testify, however, that charcoal lighter fluid would qualify while alcohol and rubbing alcohol would not. (RR5: 93, 99-100).

## SUMMARY OF ARGUMENT

**Issues 1, 2 & 3:** The trial court prevented Appellant from cross-examining the complainant from data contained in records kept by Child Protective Services about false and/or mis-leading statements she made regarding her drug use to law enforcement. This line of questioning was germane to establishing that the complainant had a motive to lie about Appellant's involvement, if any, in her

---

[15] At one point during jury deliberations, the jury asked for this evidence. (RR6: 51). Because the cans had not been opened, they were opened in the courtroom prior to being delivered to the jury. (RR6: 51, 51). Once opened, the contents of the cans emitted a strong "overwhelming" odor. (RR6: 52, 53, 55). The trial court judge brought the jury into the courtroom ("since we've already stunk up the courtroom") to view the evidence. (RR6: 53, 54, 55).

16

injuries. The trial court compounded that error by refusing to permit defense counsel to re-open for additional cross-examination and by sustaining the State's objection to jury argument concerning the complainant's history of deception to law enforcement. These errors constitute an abuse of discretion which entitles Appellant to a reversal and to a new trial.

**Issues 4, 5 & 6:** The jury charge erroneously contained full definitions for the culpable mental states of intentional, knowing and reckless, despite the fact that aggravated assault is a result-oriented crime. These definitions were not limited in the application paragraphs. The lack of proper definitions and guidance to the jury resulted in some harm to Appellant requiring a reversal.

## ARGUMENT

### Point of Error 1, Restated

*The trial court abused its discretion by limiting defense counsel's cross-examination of the complainant. (RR4: 103-105; RR5: 109).*

### Point of Error 2, Restated

*The trial court abused its discretion by denying defense counsel's request to re-open for the purpose of additional cross-examination of the complainant. (RR6: 6).*

### Point of Error 3, Restated

*The trial court abused its discretion by sustaining the State's objection to defense counsel's jury argument regarding the complainant's lack of honesty to law enforcement and instructing the jury to disregard that argument. (RR6: 42-53).*

The trial court abused its discretion by preventing the defense from cross-examining Warren from records kept by Child Protective Services (hereinafter CPS) about false and/or mis-leading statements she made regarding her drug use. This line of questioning was germane to establishing that Warren had a motive to lie about Appellant's involvement in her injuries. The trial court compounded that error by refusing to permit defense counsel to re-open for additional cross-examination and by sustaining the State's objection to jury argument concerning Warren's history of deception to law enforcement. Consequently, Appellant is entitled to a reversal and to a new trial.

## Standard of Review

A trial court's decision to exclude evidence or limit cross-examination is reviewed under an abuse of discretion standard. *Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010); *Billodeau v. State*, 277 S.W.3d 34, 43 (Tex. Crim. App. 2009). The trial court abuses its discretion when its determination lies outside the zone of reasonable disagreement. *Martinez*, 327 S.W.3d at 736; *Billodeau,* 277 S.W.3d at 43.

The same standard is utilized when a trial court refuses a request to re-open the testimony. *Peek v. State*, 106 S.W.3d 72, 79 (Tex. Crim. App. 2003); *see also* TEX. CODE CRIM. PROC. art. 36.02 (providing that a court "shall allow testimony to

be introduced at any time before the argument of a cause is concluded, if it appears that it is necessary to a due administration of justice").

Similarly, a trial court's ruling on an objection to jury argument is reviewed on appeal for an abuse of discretion. *Davis v. State*, 329 S.W.3d 798, 825 (Tex. Crim. App. 2010).

**Facts**

The record reflects multiple efforts by defense counsel to cross-examine Warren about the contents of CPS records in order to discern a potential motive for her to lie in this case. These efforts were thwarted by the trial court's erroneous rulings.

*Initial Cross-Examination*

On cross-examination, defense counsel sought to question Warren about prior statements she made and interactions she had with CPS[16] over the State's objections:

> Q. (BY MR. KING) And when you were asked by the State who all lived at the apartment, you mentioned yourself, you mentioned Chris, you mentioned your stepbrother, but you didn't mention your kids, because your kids really don't live with you.

---

[16] Appellant recognizes that CPS records are generally confidential and privileged from disclosure. *See* TEX. FAM. CODE § 261.201. However, constitutional considerations may require the admission of evidence that rules of procedure or evidence would otherwise bar. *Billodeau v. State,* 277 S.W.3d 34, 43 (Tex. Crim. App. 2009).

They stay with other family members, your sister or somebody else, right?

A. Correct.

Q. And in all fairness, that's because of the drug use you've been involved with over the course of your life.

A. Partially, correct.

Q. Well, you've had events where your children had to go live with --

MS. GARLAND: Your Honor, at this time I'm gonna object to this line of questioning without a hearing.

THE COURT: I'll allow him to finish this question.

Q. (BY MR. KING) You've had – you've had periods where your children would have to go live with other relatives.

A. Correct.

Q. And you haven't always been honest about whether or not you've used drugs when -- when people have questioned you about whether you've -- were using drugs; is that fair to say?

A. No. I'm honest.

Q. Well, when CPS investigated you back in 2008 –

MS. GARLAND: Object to relevance, your Honor.

THE COURT: Objection overruled at this point. Go ahead and ask your question.

Q. (By Mr. King) -- you were pregnant and you lied about using drugs.

A. I told the truth.

20

Q. When you were pregnant in 2008 and CPS came and talked to you and Scott, you lied about whether or not you had been using drugs.

A. And I told them the truth.

Q. You went to take a hair follicle test, and you and Scott, when you found out you had to take a hair follicle test, you both bolted out of the place and, ultimately, you did take the test which showed you had been positive for drugs.

But you initially told CPS that you had lied -- that you had not been using drugs while you were present -- pregnant, excuse me -- and that was not true. That was a lie.

You don't recall that?

A. I did tell them the truth. I told them that I had been using for the first five months of my pregnancy; I didn't know I was pregnant until the fifth month; so I told her I would be dirty.

Q. You didn't tell them that until after you had tested positive for drugs.

A. Not correct.

Q. Okay. So if the CPS records reflect that's the – that's the sequence of events, they're just wrong?

A. Hmmm, it shouldn't even be there like that.

Q. Okay.

A. I told them the truth.

Q. Would it help you -- have you ever seen the CPS records?

A. Yes.

Q. All right. Would it help you to review any of that, just to see what -- what their interviews reflect?

A. I mean, no.

Q. Do you recall in 2008 -- or 2006 --

MS. GARLAND: Your Honor, may we approach at this time?

THE COURT: Yes.

(RR4: 91-94).

### *Proffer at a Hearing Outside the Presence of the Jury*

Thereafter, a hearing was held outside the presence and hearing of the jury at which defense counsel sought the trial court's permission to cross-examine Warren about certain contents of the CPS records. (RR4: 94-107).

At this hearing, Warren admitted that she had been investigated in 2005 by CPS over the death of her five-month-old son. (RR4: 96, 97). The medical examiner could not dispositively determine whether that child had died as a result of a criminal or non-criminal act. (RR4: 96, 97). There was some question over whether Warren had told CPS and/or the police that she had been using drugs at the time the child died or was just tired from work. (RR4: 97). She did not recall if she had ever been asked to take a drug test in 2005 and failed to show for that test. (RR4: 97, 98).

Warren further admitted that when CPS initially got involved, she may have

"very well" denied that she was a drug user. (RR4: 95). She recalled calling her caseworker on August 27, 2008, because she was upset that she "would be taking a hair follicle test at Forward Edge" and worried because she had used cocaine before she knew she was pregnant. (RR4: 95-96). She was aware that on September 8, CPS had received results from Forward Edge that she had tested positive for cocaine as well as "other metabolites of controlled substance." (RR4: 96).

Defense counsel also asked if Warren recalled an event sometime around December 2007-January 2008 when she and Segalla were "drunk and high" and he "dropped the baby, the baby landed on its head and neck, but y'all did not take the child to a hospital for examination due to your fear of being caught high and drunk." (RR4: 102) Warren responded that she recalled Segalla "dropping my oldest" but said the rest of counsel's question was inaccurate. (RR4: 102). She admitted, however, that she was using drugs during this time. (RR4: 102).

Counsel summed up his intended cross-examination as follows:

Q. All right. Well, this was the same time that you were pregnant. This was the same time that you came in and you gave a hair follicle test at Forward Edge and you tested positive for amphetamine, marijuana, cocaine. So you were using drugs at that point in time?

A. Right.

Q. That's the same…time frame, except it's eight months earlier when this baby gets dropped. So you've got a circumstance where sometime

in…early January of 2008, y'all were high and drunk, the baby gets dropped, but the baby's not taken to the hospital to see if…he's got any injuries because y'all are afraid that you're gonna be exposed because you're high and drunk.

And then eight months later, somebody's calling in and reporting you to CPS for using drugs, you deny using drugs, you test positive for drugs, you finally admit that you're using drugs while you were pregnant.

And then prior to that, in 2005, you're high on drugs and your son dies while he's in y'all's care through neglect because y'all are too high to take care of the child and you initially misrepresent what happened there to law enforcement.

And that's the sequence of events; isn't that correct?

A. Correct.

(RR4: 102-103).

In urging admissibility, defense counsel made the following arguments to the trial court:

MR. KING: Your Honor…the State has painted a picture in the presence of the jury that she's been honest about her drug use, which is not the truth. There's this allegation…that somehow she's been forthright, and she hasn't always been forthright with law enforcement in making a statement about the event that's taking place.

I believe that the evidence is gonna show that…her not telling the truth on occasions…is…impeachable to show credibility in front of the jury.

I think it's germane, and I think that the issue is gonna be that because of the inconsistencies…(and)…multiple statements that she gives to law enforcement in this particular event that brings us to this Court, that those conflicts are going to raise an issue as to credibility as well.

24

**

The State has presented to the jury…that she's…honest…

And once they paint that like that, then they've opened the door, and I think we're entitled to go into it.

(RR4: 98-99). The State indicated that it had a motion in limine[17] in place regarding the CPS records because the State did not believe those records to be relevant and did not want Warren's cross-examination to become "character assassination."[18] (RR4: 100, 101).

The trial court ruled as follows:

The Court, after having listened to arguments of both counsel and, also, having heard the proposed questions that Mr. King would like to…ask the witness, the Court is…ordering that the defense attorney is not to go into any CPS involvement.

These cases are too remote. We're talking about November 2005, we're talking about August 2008. They are not relevant to the case presently before the defendant [sic]. The issue before the defendant [sic] is whether she was using drugs or high or intoxicated on the night of…July the 29th and 30th of 2013, which clearly is five years or if not more time past the time that the CPS involvement has…happened.

She's already admitted she was using drugs that night. Her CPS

---

[17] The record does not reflect a formal, written motion in limine. However, the trial court did grant an oral motion in limine to the State as to any "bad acts" of the State's witnesses. (RR3: 208-209).

[18] Defense counsel also wanted to cross-examine Warren on a recent theft conviction; the State had no objection to that testimony. (RR4: 98-100).

25

involvement has no relevance whatsoever in regards to whether or not she was a victim of an aggravated assault. For that reason, the Court is not going to allow you to go into any testimony regarding that.

It… is not even relevant for the purpose of impeachment at this point. So my ruling is very clear. You are not to go into anything having to do with any CPS involvement. You are not to go into anything having to do with her making misrepresentations to CPS at any point regarding her drug usage unless it's near the time of 2013.

(RR4: 103-105).

Defense counsel acknowledged the trial court's ruling. (RR4: 105). Defense counsel proffered the CPS records as Defense Exhibit A. (RR4: 105; *see also* RR5: 109-110).

Defense counsel and the trial court continued to discuss the issue. Defense counsel stated that the inconsistencies in Warren's testimony and the CPS records were admissible for impeachment as she had not been truthful. (RR4: 105-106). The trial court said that "the jury should not have evidence that leads them to believe that she is not credible as a victim of an offense based upon the fact that she may or may not have been a good mother."[19] (RR4: 106). Defense counsel further argued:

MR. KING: The…point being that…when she's under the influence…of drugs…she is not credibly honest to law enforcement. And that's what I'm trying to present to the jury, since the accusation

---

[19] The jury had already heard evidence from which is could concluded that Warren was not a good mother, *i.e*., her extensive drug usage and the fact that her children did not live with her.

26

is that she says that Christopher Price set her on fire. And that's the issue that I'm offering it on as to whether or not that is a credible statement by her to law enforcement…since she's high.

(RR4: 106). The trial court judge stated that she had made her ruling. (RR4: 106).

Defense counsel responded that he was simply trying to make a clear record. (RR4: 107).

*Proffer at the Close of Evidence*

Towards the close of the evidence, defense counsel again made a proffer of proof to the trial court:

MR. KING: Your Honor, I would like to be able to ask Leslie Warren questions in regards to the CPS investigation back in 2005, and here's the basis of it.

Back in 2005, the allegations were that she had been involved with excessive methamphetamine use and had literally passed out. That was what had taken place.

And during the course of her being passed out, her child had passed away somehow; manner and means unknown to the medical examiner, SIDS, whatever, her fault, nobody's fault, I'm not sure. But the point is she used methamphetamines to such an excessive point that she passed out.

Now…once again in 2008, there's some indication of methamphetamine use, of significant methamphetamine use where CPS is called back in, where a child is injured and the child is not taken to the medical facility because of the methamphetamine use or the fear…that telling somebody they were high might cause them some type of problems or whatever. So there's this avoided situation.

I will note that in 2005, she denied initially having been on methamphetamine and had just been tired, supposedly. And her story

27

to CPS didn't match up with what the other people said about who found the baby dead and all this other.

So she has this history of drug use coupled with not telling the complete truth about what the circumstances are at that point in time dealing with significantly important personal issues; death of a child, injury to another child.

Then we have some period of time where she says she's sober, okay? But we know she's back on methamphetamine and it's clear from the evidence she's got an extensive history of…using drugs for either a couple of weeks or a couple of months; but for the last couple of days, she's been up smoking meth and that's obvious to the fire investigators, the medical personnel, everybody.

The point of this is that there is a lapse of about four hours where there's no testimony as to what was actually going on or what was taking place. She describes the event of getting a phone call at about 7:00 or 8:00 in the morning from Rob, and he's gonna come over and pick up the truck.

Rob says when he called, he was there in an hour or an hour and a half; that's kinda sketchy. But then…it's clear that this fire doesn't start until about 12:30 to 1:00 o'clock. That's when this fire starts. The police get notified at 12:55; they come rolling in.

So between 8:00 and 12:00, there's a 4-hour gap where it's not clear who's where, what's going on and what's taking place. Now, because there's that gap in time, it's the contention of the Defense that she very well may have been passed out before anything -- you know, may have been passed out, may have been smoking in bed, may have set this fire up.

The testimony is she could have received these injuries that she got not being set on fire at all but just being in close proximity to the heat, because the heat that can blister walls without even flames getting close, certainly it's gonna blister skin and singe hair.

28

Her story is inconsistent between what she initially tells law enforcement about being tied up and bound in the bathroom, and it is inconsistent with her testimony on the witness stand. Her…statements initially to the investigators is that she runs out of the burning bedroom allegedly into a bathroom, hides for a while until smoke starts coming in the door and then leaves and leaves out of the apartment.

What she testified on the stand is that she jumped over the burning bed soaked in charcoal lighter fluid, somehow didn't burst into flames, jumped into the arms of Christopher Price, who caught her in a bear hug and somehow hit her in the back of head in the course of that bear hug, striking her in the head…creating these substantial lacerations, at which point she passes out, wakes up outside of the bedroom and doesn't have any recollection…after that point.

I think it's germane to show that her significant drug use has been historically, in the past, a factor where she doesn't tell the truth about events that are surrounding the immediate use and…any other unusual events that occur while she's high as a kite.

We have the death of a baby in 2005, we have an injury to a child in 2008, and then we have a fire in 2013. I believe there is a pattern of behavior and untruth on her part, lack of veracity, in explaining facts and circumstances surrounding events where she's been up for a couple of days smoking methamphetamine.

Because of that causal effect, we feel we're entitled to go into what happened in 2005 and 2008 in a more particular manner.

(RR5: 102-105). The State again responded that defense counsel was attempting to "assassinate her character." (RR5: 106, 108). The State further argued that the type of cross-examination in which defense counsel wished to engage was barred by Rule 608 (b) of the Rules of Evidence. (RR5: 107); *see also* TEX. R. EVID. 608(b).

Defense counsel emphasized that the State had "opened the door" during opening statement by claiming that Warren was an honest person. (RR5: 108). Indeed, during its opening statement, the prosecutor said "Leslie Warren is…a very honest person." (RR4: 16). Warren had also insisted in cross-examination that she was an honest person. (RR4: 92). Defense counsel also stated as follows:

> The point we're trying to get across to the jury is not that she's a bad mother; it's that bad things happen when she's blown away, intoxicated on methamphetamines. Bad things happen to people that she cares about or people that she's around or whatever. That's the point.
>
> The point is when she's high, trauma follows her of some kind. *And our position is that the defendant never set her on fire. However this fire got started could be as a result of all kinds of things and her spinning of this tale very well may be that she's trying to avoid, you know, another CPS investigation, she's trying to avoid responsibility for setting the apartment on fire by smoking in bed.* She's trying to avoid all kinds of things.

(RR5: 108-109) (emphasis added). The trial court stated that it was sticking to its original ruling. (RR5: 109).

### *Request to Re-Open*

At the conclusion of the evidence and just prior to jury argument, defense counsel asked to re-open for the purpose of cross-examining Warren regarding the CPS record as they were "germane to her motive to testify falsely to law enforcement as a result of the events that transpired." (RR6: 5). As counsel argued to the trial court:

(BY MR. KING) We think it becomes germane with regards to that. We believe that the inconsistent statements given by Ms. Warren to law enforcement as to the circumstances that took place reflect a disjointed and untruthful scenario.

We further believe that the CPS records are germane because they reflect circumstances in which Miss Warren was under the influence of methamphetamine and her resultant behavior. We believe that's consistent with the events that we have in this matter. So it's a two-fold circumstance.

I just want to make sure that's clear in the record, but we would ask to reopen, recall Miss Warren, and be allowed to cross-examine on those particular issues.

(RR6: 5-6). The trial court denied defense counsel's motion to re-open, stating that it had ruled several times on the CPS record and that those records were not relevant to the trial. (RR6: 6).

### *Jury Argument*

During final jury argument, defense counsel sought to argue as follows: "She's got a history of not being honest with law enforcement when it comes to important matters in her life and responsibilities, and she didn't want CPS crawling back over her." (RR6: 42). The trial court, however, sustained the State's objection to this argument and instructed the jury to disregard it. (RR6: 42, 43).

## Relevant Law

The Sixth Amendment's right to confront witnesses includes the right to cross-examine witnesses to attack their general credibility or to show their possible

31

bias, self-interest, or motives in testifying. U.S. CONST. amends. VI, XIV; TEX. CONST. Art. I § 10; *Davis v. Alaska*, 415 U.S. 308, 316 (1974); *Hammer v. State*, 296 S.W.3d 555, 561 (Tex. Crim. App. 2009). Appellant recognizes that this right is not unqualified and that a trial judge has discretion to limit the scope and extent of cross-examination. *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986); *Hammer*, 296 S.W.3d at 561. A trial court, however, violates a defendant's right of confrontation if it improperly limits appropriate cross-examination. *Carroll v. State,* 916 S.W.2d 494, 497 (Tex. Crim. App. 1996).

The law recognizes a distinction between an attack on the general credibility of a witness and a more particular attack on credibility that reveals possible "biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand." *Davis,* 415 U.S. at 316; *Hammer,* 296 S.W.3d at 562. The exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination. *Davis,* 415 U.S. at 316; *Hammer,* 296 S.W.3d at 562.

The Texas Rules of Evidence contain a certain tension as to exactly when and how a witness's credibility may be attacked. Under Rule 404(a)(3), a defendant may always offer evidence of a pertinent character trait, such as truthfulness, of any witness. TEX. R. EVID. 404(a)(3). But, under Rule 608, a witness's general character for truthfulness may be shown only through reputation

32

or opinion testimony and may not be attacked by cross-examining him, or offering extrinsic evidence, concerning specific prior instances of untruthfulness. TEX. R. EVID. 608(b). An exception exists, however, if a witness may be cross-examined on specific instances of conduct when those instances are used to establish his specific bias, self-interest, or motive for testifying. *Hammer*, 296 S.W.3d at 563. Counsel must first cross-examine the witness with the circumstances surrounding the bias, interest, or motive, and, if the witness denies the circumstances or the motive, the opponent may introduce extrinsic evidence to prove the motive or bias. TEX. R. EVID. 613(b). The Rules of Evidence also permit the defense, as well as the prosecution, to offer evidence of other acts of misconduct to establish a person's motive for making a false allegation against the defendant. TEX. R. EVID. 404(b).

For example, in *Hammer*, the defendant presented evidence that the complainant fabricated the sexual molestation accusation so that she did not have to live with her father. 296 S.W.3d at 566. Evidence was also heard that the complainant was generally angry with her father because he would not let her do whatever she wanted; the defendant was allowed to cross-examine her generally about her motive to falsely accuse her father. *Id*. at 566-67. The trial court, however, excluded evidence that the complainant was particularly angry with her father because he took her to the hospital for a sexual assault examination after she had stayed out overnight. *Id*. at 567. The trial court excluded evidence that the

33

complainant told different stories about who she had sex with that night and that the complainant became so upset with her father that she threatened to commit suicide and was admitted to the state hospital. *Id.* The alleged offenses occurred approximately a month after she was released from the state hospital. *Id*. The Court of Criminal Appeals concluded that the excluded evidence strongly supported the defensive theory that the complainant had a motive to falsely accuse the defendant of sexual molestation. *Id.* Consequently, the Court found that the evidence was admissible to prove the complainant's bias against the defendant and to show her purported motive in falsely accusing him. *Id.*

## Application of the Law to the Facts

Here, Warren's credibility was the entire case the State had against Appellant. She was the only witness who testified that Appellant doused her with an ignitable liquid and set that liquid on fire. (RR4: 49-60). While there was testimony that her injuries were consistent with being set on fire, there was also testimony that burns such as hers could come from being in proximity to a hot burning fire.[20] (RR5: 19, 61, 62).

Appellant's defense at trial was that the fire could have been set accidentally and that the State could not prove that Appellant actually set Warren on fire. (RR5:

---

[20] The fire investigator testified that he estimated the heat around the bed in the master bedroom was "probably around the bed 16 to 1800 degrees at one point." (RR5: 61).

108-109; RR6: 27-43). There was, of course, no dispute that Warren had been using methamphetamine in the days leading up to the fire and that she had not slept for a period of time. (RR4: 91; RR5: 75). An open package of cigarettes was found by the bed and a lighter was found nearby, leading to an argument that smoking in bed could have caused the fire as opposed to an intentional act on Appellant's part. (RR5: 46, 53, 78). Indeed, Warren was specifically asked by Holzheuser if she had been smoking a cigarette in bed and "she just wouldn't give me an answer." (RR4: 190; *see also* RR5: 58). There was no evidence of a charcoal lighter fluid bottle or container being recovered at the apartment, though a lighter was recovered. (RR6: 36).

Appellant recognizes that Warren admitted using drugs in the days and hours preceding the fire. However, her actual drug use was not the issue. Rather, the point defense counsel was seeking to make was that Warren had a motive to lie and/or to omit telling the truth to law enforcement about that drug use and that she also made inconsistent statements to law enforcement officers which differed from her testimony at trial.

The defense had evidence in the CPS records that Warren had lied on prior occasions about the extent of her drug usage to avoid negative consequences, particularly where her children were concerned. Her potential motive to lie was clear – accuse Appellant of intentionally setting the fire and deflect attention from

35

herself and her behavior. This was a legitimate line of questioning which defense counsel should have been permitted to explore. Moreover, defense counsel had questioned Warren on her honesty to CPS investigators and law enforcement and Warren had insisted that she told the truth, (RR4: 91-94), which qualifies as admissible impeachment evidence under Rule 613(b). The failure of the trial court to allow defense counsel to cross-examine Warren on the contents of these records, coupled with the trial court's (1) refusal to permit the defense to re-open for additional cross-examination and (2) action sustaining the State's objection to jury argument concerning Warren's history of deception to law enforcement, amounts to an abuse of discretion which entitles Appellant to a reversal and to a new trial.

## Point of Error 4, Restated

*The trial court erroneously included the full definition of intent in the jury charge. (CR1: 92).*

## Point of Error 5, Restated

*The trial court erroneously included the full definition of knowledge in the jury charge. (CR1: 92).*

Prior to the charge being read to the jury, the prosecutor, after an off-the-record discussion, asked for changes to the definitions in the charge of the culpable mental states, *i.e.*, intentional, knowing and reckless, to include the full statutory definitions. (RR5: 132, 133). Defense counsel objected to the full definitions, particularly to intentional and knowing, stating that aggravated assault was a

"result-oriented offense."[21]  (RR5: 133, 134; *see also* RR5: 138).  The trial court

granted the State's request and included the full definition of all culpable mental

states alleged in the indictment in the jury charge. (CR1: 92; RR5: 137).

**The Jury Charge**

The trial court instructed the jury as follows:

A person acts intentionally, or with intent, with respect to the nature
of his conduct or to a result of his conduct when it is his conscious
objective or desire to engage in the conduct or cause the result.

A person acts knowingly, or with knowledge, with respect to the
nature of his conduct or to circumstances surrounding his conduct
when he is aware of the nature of his conduct or that the
circumstances exist. A person acts knowingly, or with knowledge,
with respect to a result of his conduct when he is aware that his
conduct is reasonably certain to cause the result.

(CR1: 92). The application paragraphs did not limit the definitions of intent or

knowledge any further. (CR1: 95-96).

---

[21] Defense counsel stated "I object to his objection." (RR5: 133). The trial court replied: "You object to his objection meaning that you want the definitions to remain as they are?" (RR5: 133). Defense counsel replied "That's correct." (RR5: 134). Interestingly, there is no reference in the record as to how the definitions read before the State made its request. Nevertheless, the context of the discussion is sufficient to preserve error as it is clear defense counsel objected to the giving of the full statutory definitions of intent and knowledge in the jury charge and sought to limit the definitions to the result of Appellant's conduct. *See Clark v. State,* 365 S.W.3d 333, 339 (Tex. Crim. App. 2012) (noting that an issue may be preserved without having been explicitly stated if "there have been statements or actions on the record that clearly indicate what the judge and opposing counsel understood the argument to be").

## Aggravated Assault is a Result-Oriented Crime

A person commits the offense of aggravated assault if he intentionally, knowingly, or recklessly causes serious bodily injury to another. TEX. PENAL CODE § 22.02(a)(1). Aggravated assault, like murder, is a result-oriented offense. *Landrian v. State*, 268 S.W.3d 532, 533, 537 (Tex. Crim. App. 2008); *see also Mendenhall v. State*, 15 S.W.3d 560, 567 (Tex. App. – Waco 2000), *aff'd on other grounds*, 77 S.W.3d 815 (Tex. Crim. App. 2002); *Brooks v. State*, 967 S.W.2d 946, 950 (Tex. App. – Austin 1998, no pet.).

In a jury charge for a result-oriented offense, the statutory definitions of the applicable culpable mental states should be limited to the result of the prohibited conduct. *Cook v. State,* 884 S.W.2d 485, 490 (Tex. Crim. App. 1994). The jury charge should define the mens rea terms of "intentionally" and "knowingly" in accordance with the "result-oriented" definitions stated in the Texas Penal Code. TEX. PENAL CODE § 6.03(a), (b). A charge which contains the full statutory definitions is erroneous. *Cook,* 884 S.W.2d at 491.

## Application of the Law to the Facts

In the case at bar, Appellant was indicted for intentionally, knowingly, and recklessly causing serious bodily injury to Warren by setting her on fire. (CR1: 13). The jury was provided, over defense counsel's objections, with the full definitions of intentionally and knowingly. (CR1: 92; RR5: 133, 134, 137).

Here, the definition portion of the jury charge defined the culpable mental states with respect to the nature of conduct, the result of conduct, and the circumstances surrounding of the conduct. The application paragraph in no way limited these definitions or provided guidance to the jury. Rather, the jury was permitted to find Appellant guilty if it found that he intentionally or knowingly caused the prohibited result, *i.e.,* serious bodily injury. The law as recited in the application paragraphs thus failed to correctly point the jury to the appropriate mental state as it did not limit the jury's consideration of the abstract definitions given. In short, the charge allowed the jury to do that which the law did not: find Appellant guilty of aggravated assault based on the nature of his conduct or on the knowledge of the circumstances surrounding his conduct, rather than on intending to cause or knowing the prohibited result, *i.e.*, serious bodily injury. *Chaney v. State*, 314 S.W. 3d 561, 567,-68 (Tex. App. – Amarillo 2010, pet. ref'd). Hence, the trial court clearly erred by giving over-inclusive definitions for "intentionally" and "knowingly" in the jury charge.

## Appellant Suffered "Some Harm" by the Erroneous Instructions

Where, as here, a defendant properly objects to a jury instruction, the error requires reversal upon a finding of "some harm" to his rights. *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985). The harm caused by the error should be considered (1) in light of the entire jury charge, (2) the state of the evidence,

39

including the contested issues and the weight of probative evidence, (3) the arguments of counsel and (4) any other relevant information revealed by the record of the trial as a whole. *Id.* at 171; *see also* TEX. CODE CRIM. PROC. art. 36.19.

### *The Entire Jury Charge*

The charge in this case was complicated as it included not only multiple definitions (CR1: 90-94), but also two lesser included offenses wherein the differing elements were more subtle than the average lesser instruction. (CR1: 95-97). In these same instructions, the jury was asked to consider findings of both family violence and a deadly weapon. (CR1: 95-97). The potential for jury confusion was quite high and additional guidance was certainly required.

### *The State of the Evidence*

At first blush, the state of the evidence, including the contested issues and the weight of probative evidence, might be seen to weigh in favor of a finding of no harm. Clearly, Warren had suffered severe injuries and she testified that Appellant doused her with lighter fluid and set the fire in which she was burned. However, the State's case rested entirely on her credibility that these acts, if indeed true, were the cause of her injuries, despite other possibilities contained in the record. Indeed, the fire investigator tested that it was the bed that was set on fire and that proximity to the fire could cause severe burns. (RR5: 34, 56, 61-62, 78). Under the charge given, the jury could have convicted because it found that

Appellant intended to engage in the conduct (*i.e.*, setting the fire on the bed), rather than that he intended to cause the result (*i.e.,* serious bodily injury to Warren), or that he was aware of the nature of his conduct and the surrounding circumstances rather than that he was aware that his conduct was reasonably certain to cause the result.

### *The Arguments of Counsel*

With respect to the arguments of counsel, the State concentrated it arguments on the severity of the injuries suffered by Warren and Warren's credibility. (RR6: 21-26, 43-50). Neither prosecutor attempted to guide the jury with respect to the intricacies of the culpable mental state it needed to find before it could return a conviction.

### *The Record as a Whole*

The error in this case is further compounded by the State's evidence and arguments that went beyond the allegations in the indictment. Specifically, the jury heard evidence that Appellant may have hit Warren over the head when she tried to escape from the burning bedroom. (RR4: 57, 58, 60, 72-73, 135, 137). Both prosecutors argued that Appellant "burned her…beat her, and…left her to die." (RR6: 50; *see also* RR6: 26, 43, 45). Yet, the sole allegation in the indictment was that Appellant caused serious bodily injury by "setting fire" to Warren. (CR1: 13). The State did not allege that Appellant beat Warren or attempted to murder her.

Again, the jury lacked guidance as to exactly what needed to be found in order to return a conviction.

In this case, the application paragraph authorized conviction if the jury found that Appellant "intentionally or knowingly" caused serious bodily injury to Warren. No further definition was provided. Thus, the application paragraph failed to properly instruct the jury on the correct culpable mental state, and the abstract definitions of intent and knowledge contained definitions inapplicable to an aggravated assault prosecution. Under the facts of this case, it cannot be said that Appellant did not suffer some harm under the *Almanza* standard. Appellant is entitled to a reversal and to a new trial.

### Point of Error 6, Restated

***The trial court erroneously included the full definition of reckless in the jury charge. (CR1: 92).***

Appellant's arguments and authorities set forth under Points of Error 4 and 5, *supra*, are incorporated by reference herein.

While defense counsel objected to the full definition of reckless in the jury charge, counsel recognized that the State "might make a case for giving the full definition of reckless." (RR5: 133, 134, 137). The State did not, however, attempt to make a case for giving the full definition of reckless to the trial court. The court overruled defense counsel's objections (RR5: 137) and the charge contained the

42

full definition of reckless:

> A person acts recklessly, or is reckless, with respect to the circumstances surrounding his conduct or the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances, as viewed from the actor's standpoint.

(CR1: 92); *see also* TEX. PENAL CODE § 6.03(c).

As previously noted, aggravated assault is a result-oriented crime. The law regarding the appropriate definition of reckless in a result-oriented crime is far less well developed than that regarding intent and/or knowledge. Indeed, to the best of the undersigned attorney's research, the only court which has even partially addressed the issue on the merits said as follows: "the distinction between 'nature of conduct' and 'result of conduct' becomes blurred with respect to offenses based upon a reckless" act. *Chaney,* 314 S.W. 3d at 569; *see also Vallair v. State*, No. 09-11-00038-CR, 2011 Tex. App. LEXIS 7055 at * 8 (Tex. App. – Beaumont August 31, 2011 pet. ref'd) (not designated for publication) (considering and rejecting a claim of egregious harm from the full definition of reckless based on the specific language of the application paragraph without providing a specific analysis). However, it seems clear to Appellant that the same analysis applies to the definition of reckless as to intent and knowledge since all three definitions

43

permitted a conviction in this case on a finding of acts done with a purpose other than causing the result, *i.e.,* serious bodily injury. Hence, the same result should apply. Appellant is entitled to a reversal and to a new trial.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Appellant prays that this Court will reverse Appellant's conviction and remand for a new trial.

Respectfully submitted,

*/s/ Katherine A. Drew*

| | |
|---|---|
| Lynn Richardson | Katherine A. Drew |
| Chief Public Defender | Assistant Public Defender |
| Dallas County, Texas | State Bar No. 06117800 |
| | Frank Crowley Courts Building |
| | 133 N. Riverfront Blvd., LB-2 |
| | Dallas, Texas 75207-4399 |
| | (214) 875-2360 *(phone)* |
| | (214) 875-2363 *(fax)* |
| | Kathi.Drew@dallascounty.org |

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing brief was served on the Dallas County Criminal District Attorney's Office (Appellate Section), 133 N. Riverfront Blvd., LB-19, 10th Floor, Dallas, Texas, 75207, by electronic transmission and by hand delivery on March 18, 2015.

*/s/ Katherine A. Drew*
Katherine A. Drew

## CERTIFICATE OF COMPLIANCE

I hereby certify that the word count in this document, which is prepared in Microsoft Word 2010, is 10,843.

/s/ Katherine A. Drew
Katherine A. Drew