

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## NO. PD-0969-07

**DAVID CLYDE BILLODEAU, Appellant**

**v.**

**THE STATE OF TEXAS**

**ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW
FROM THE FIRST COURT OF APPEALS
HARRIS COUNTY**

**JOHNSON, J., delivered the opinion for a unanimous Court.**

## O P I N I O N

This Court granted appellant's petition for discretionary review to decide a single issue:

> When a defendant is accused of aggravated sexual assault, and the
> only evidence in the case consists of the testimony of the complainant
> and the testimony of the accused, should the trial court prevent the
> defense from presenting evidence about threats and false, similar
> allegations made by the complainant after the date of the charged
> offense, but before the date of the complainant's testimony at trial?

Appellant's argument to this Court is that he was prevented from questioning the

complainant, J.B., about threats he made to neighbors when they angered him, that he would falsely

accuse them of molesting him. Outside the presence of the jury, appellant questioned J.B. about the

threats, and J.B. denied making them. The trial court ruled that appellant could not present that evidence to the jury because the alleged threats had been made after the charged offense. Because appellant was not permitted to ask those questions in front of the jury and get J.B.'s denials before it, he was therefore not permitted to present his defense, which was contained in the testimony of those neighbors, the Klines, that the threats denied by J.B. were, in fact, made. We reverse.

The record reflects that appellant moved to Texas in late 2002. Shortly after arriving, he moved into the Baytown home of Robert and Edith Wolfe. The Wolfes introduced appellant to the Basses, the complainant's family. In May 2003, appellant was injured in a bicycle accident and stayed in the hospital overnight. When appellant was released from the hospital, the Basses invited him to stay in their home while he recuperated. During this time, appellant spent a lot of time with the then-eight-year-old complainant, J.B. Appellant later moved into his own apartment in Channelview and then to Louisiana.[1] At some point, appellant bought J.B. two remote-control cars as a gift.[2] J.B.'s mother disapproved and insisted that appellant reclaim the cars and take them to the Wolfes' home. When appellant attempted to take them back, J.B. went into rage, threw the cars at appellant, hitting him in the back, and swore at him.[3]

In late July 2003, J.B. visited the home of his neighbor, Marilyn Jordan, to play with her

---

[1] Depending on the witness, appellant lived with the Basses between 2 weeks and two and a half months.

[2] Appellant asserted that he bought the cars around the time of the birthday of J.B.'s sister because he did not buy J.B. anything for his birthday and, indeed, did not know when his birthday was.

[3] J.B. testified that he accused appellant of sexually assaulting him the day after appellant reclaimed the remote-control cars. The deputy's report indicates a date of July 29th, a Tuesday. The doctor who examined him testified that the medical examination was performed on July 30th, a Wednesday. This tends to put the date of the reclamation as Monday, the 28th of July. Mr. Bass asserted that the car incident took place after the accusation, but that would require the Basses to have allowed appellant into their home after an accusation that he had molested one of their children.

young son. During the visit, Ms. Jordan asked J.B. if appellant still lived with his family,[4] but J.B.'s reaction to her question was "odd." Ms. Jordan testified that "he hung his head down and started crying." She asked him what was wrong, but he remained silent. She pressed him, and he told her that appellant had taken him to a motel and had made J.B. touch his "thing," and that appellant had stuck his "thing" into J.B.'s anus. J.B. asserted that he had told only Ms. Jordan of the incident. She instructed J.B. to go home immediately and to tell his parents. J.B., however, stated that he did not want to inform his parents of the incident because he was afraid of being taken away from them.[5] Afraid that J.B. would not tell his parents, Ms. Jordan called the sheriff that evening. After the deputies had come and gone, Mr. and Mrs. Bass went to Ms. Jordan's home, upset that she had reported J.B.'s accusation to the Sheriff's Office.[6]

About an hour after Mr. Bass arrived home from work that evening, he noticed a deputy sheriff at Ms. Jordan's home. J.B. was riding his bicycle close by, and Mr. Bass beckoned to him. He said that he figured that the police visit involved J.B., so he asked J.B. why the deputy was at Ms. Jordan's house. J.B. teared up and, after several minutes of probing by his father, told him about the alleged offense. The deputy later came to speak to Mr. Bass about the incident. That evening, Mrs. Bass took J.B. to Texas Children's Hospital. Dr. Erin Endom, the examining doctor, testified that there were no signs of trauma, but that it is very common for a child sexual-assault victim not to

---

[4] Ms. Jordan was the manager of the trailer park. She testified that she inquired because it was against the trailer-park policy for appellant to reside with the Basses. The Basses were later evicted.

[5] The record reflects that, at some time before appellant knew them, J.B. and his sister had been removed from their home because of other sexual-assault charges.

[6] Appellant was arrested in Louisiana in January 2005, 18 months after the initial outcry, and then extradited to Texas. He was charged with aggravated sexual assault of a child. TEX. PENAL CODE ANN. § 22.021(a)(1)(B), (a)(2)(B) (Supp. 2006).

have any physical injuries because many child victims were too small to resist force, and resistance is what produces physical damage. The next day, Child Protective Services (CPS) removed J.B. and his sister from the Basses' home due to the alleged charges. They remained in state custody for approximately 11 months.

At trial, Mr. Bass testified that J.B. had been diagnosed at the age of seven with both attention-deficit disorder and bipolar disorder, which contributed to his fits of rage,[7] and that, after returning home from CPS custody, J.B.'s behavior worsened, and he displayed intense anger towards some adults.[8] Mr. Bass also testified that J.B. liked appellant and that he allowed J.B. to spend a lot of time with appellant. After appellant moved out, Mr. Bass allowed J.B. to visit appellant at his Channelview apartment almost every weekend. J.B. was with appellant on the weekend that the alleged offense took place. Mr. Bass said that he did not know where J.B. and appellant were, but that he had spoken with J.B. on appellant's cell phone during that weekend. J.B. "sounded fine," but did not say where they were. Mr. Bass confirmed that appellant did not own a car at that time.

J.B., ten years old at the time of trial, testified both that his dad dropped him and appellant off at the Palms Motel in Baytown [9] and that appellant took him there.[10] He also testified both that

---

[7] Mr. Bass testified that J.B. had taken Adderall and Restoril for attention-deficit disorder and at the time of trial was taking lithium and Restoril plus two other medications. J.B. testified that he was taking five different medications, each twice a day, including lithium, Respiritol, and Paxil.

[8] J.B. also testified that since the age of four he had seen a psychiatrist once a month because of his behavior and that he gets angry "all of the time."

[9] Q. [State] Now, when–how did you get to the motel?
A. My dad.

At trial, neither appellant nor the state asked Mr. Bass how J.B. got to appellant's apartment and back home or whether he had dropped appellant and his son off at the Palms Motel.

[10] Q. [State] And where did David take you?

(continued...)

appellant did not have a car at that time and that, later that evening, appellant drove them in his car to get food, but that they came back to the motel to eat.[11]

J.B. testified that, before he fell asleep in the afternoon, appellant began to French-kiss him and that, while he was sleeping on his stomach, appellant apparently pulled down J.B.'s shorts and climbed on top of him. J.B. stated that he awoke when appellant put his "tally whacker" into J.B.'s anus. He further stated that he eventually pushed appellant off, ran into the bathroom to dress, and then ran to the front office, but it was closed, so he went back to the room. He testified that appellant was fully dressed when J.B. returned and that appellant threatened to kill him if he told anyone about the incident. According to J.B.'s testimony, no other sexual activity occurred that evening, his father picked him up early the next morning at the motel, and appellant remained at the motel.

---

[10](...continued)
    A. Palms Motel.
       . . .
    Q. [Appellant] When did you discover that the name of the motel was the Palms Motel?
    A. When I looked at the sign.
    Q. When you looked at the sign?
    A. Yes.
    Q. Okay. And who was it that you told that David had taken you to the Palms Motel?
    A. My dad.
    Q. Okay. Do you remember when you told him?
    A. Yeah. We were in the bathroom.
    Q. Okay. You were in the bathroom?
    A. [Moving head up and down.]
    Q. In the bathroom at your house?
    A. No.
    Q. In the bathroom where?
    A. At the Palms Motel.

[11] Q. [State] Okay. Did [appellant] have a car?
    A. No.
       . . .
    Q. [Appellant] Okay. Did y'all go out and get any kind of food?
    A. Yes.
    Q. Where did you go?
    A. McDonald's.
    Q. How did you get there?
    A. [Appellant] drove.

Defense counsel made repeated attempts to question J.B. about the threats against the Klines, but each time the state objected that such inquiry was not relevant, and the trial court sustained each objection. Outside the presence of the jury, defense counsel questioned J.B. about threatening to make false accusations of molestation against the Klines, and J.B. denied both incidents. J.B. admitted to making one accusation–that appellant had molested Matthew Kline–but maintained that the accusation was true. The trial court refused to allow appellant to question J.B. about the alleged threats against the Klines in front of the jury, implicitly ruling that, because J.B. made the threats after the date on which the offense on trial was alleged to have occurred, testimony about them was not admissible.

Appellant testified and contradicted J.B.'s testimony. He denied that he had ever taken J.B. to a motel and stated that J.B.'s assertion that appellant drove them McDonald's to get food while staying at a motel was false because he did not have a car at the time. Appellant stated that he used the settlement funds from the bicycle accident to move back to Louisiana, driving with a relative in the relative's car.

Nancy and Nathan Kline each testified that they were acquainted with J.B.'s reputation for truthfulness and that it was bad. Appellant sought to present their testimony that J.B. had become angry with each of them and had then threatened to accuse each of them of molesting him.[12] Appellant argued that he had a right to present the Klines' testimony under the Confrontation Clause and thus to impeach J.B.'s credibility. The trial judge refused to admit the Klines' testimony, but permitted counsel to make a bill of exceptions.

---

[12] Appellant also wanted to present the testimony of Matthew Kline that J.B.'s allegation that appellant had molested Matthew was false.

In that bill of exceptions, testimony showed that the Klines and the Basses were neighbors. J.B. sometimes played with Ms. Kline's younger children. One day about a year after J.B. accused appellant, J.B. and his sister visited Ms. Kline's two younger children. While J.B. was playing with her children, Ms. Kline heard J.B. call his sister a bad name. She immediately reprimanded him for his behavior. She testified that, on several occasions before that day, she had warned him that she was going to wash his mouth out with soap if he used bad language, so she grabbed her dish soap and put some in his mouth. According to Ms. Kline, J.B. became enraged and began to kick and scream. In an effort to calm him down, Ms. Kline grabbed his shoulders. She testified that J.B. said, "I am going to call the cops and tell them that you're molesting me." She told him, "Well, obviously you don't know what molested means." However, he gave her an accurate definition.[13] Ms. Kline testified that J.B. had a smirk on his face when he threatened her and that when he left her house, he was angry, but still smirking.

In November 2004, a similar incident occurred between J.B. and Nathan Kline, Ms. Kline's 20-year-old son. Nancy Kline was present and also witnessed the incident. J.B. asked Nathan if his younger siblings could come out to play. Nathan told him that they were not home. Convinced that they were at home, J.B. became angry, called Nathan a liar, and told him that he was going to tell his parents that Nathan was molesting him. The state's only questions to each Kline pertained to the fact that J.B.'s threats against them were made after the date of the alleged offense. None of this testimony was heard by the jury. Appellant was convicted and sentenced to 30 years' confinement.

---

[13] The record indicates that J.B. had been molested by someone other than appellant two years before he accused appellant and that his sister had been molested by someone other than appellant shortly before J.B. accused appellant.

## The Court of Appeals's Opinion

On appeal, appellant contended that, pursuant to *Lopez v. State*, 18 S.W.3d 220, 222 (Tex. Crim. App. 2000), the exclusion of the proffered testimony violated appellant's rights under the Confrontation Clause. *Billodeau v. State*, 263 S.W.3d 318, 322-23 (Tex. App.–Houston [1st Dist.] 2007). Appellant argued that testimony about J.B.'s threats to falsely accuse the Klines of molestation were relevant and should have been admitted. He asserted that his case was similar to *Thomas,* a previous case from the court of appeals, and that the court should have followed *Thomas*. The state contended that, based on Rule 608(b), the testimony of appellant's proffered witnesses was inadmissible.

The court of appeals held that the trial court could have reasonably concluded that, "in light of the remoteness in time and the dissimilarity between" the threatened accusations against the Klines and the accusations against appellant, the probative value of the Klines' testimony was low and the risk that the jury would be unduly prejudiced or confused was high.

> Appellant's issue states that these threats were made "around the same time as the accusations in the alleged offense." As stated above, the record clearly shows that any threats by J.B. toward the Klines were made over a year *after* the instant offense, and it was on this ground that the trial court denied admission of the Klines' testimony . . . in light of the remoteness in time and the dissimilarity between the alleged threats toward the Klines and the accusation in the charged offense, the Klines' testimony was not relevant because it was not probative regarding J.B.'s credibility at the time of the instant offense. We hold that the trial court did not abuse its discretion in excluding the Klines' testimony.
>                               . . .
> Appellant has not cited any authority for his proposition that evidence that the complainant in a sexual assault may have made threats of false accusations toward others a year *after* the charged offense is relevant to determining the complainant's credibility at the time of the offense. To support his contention that the evidence was relevant, appellant relies on *Thomas v. State*, 669 S.W.2d 420 (Tex. App.–Houston [1st Dist.] 1984, pet. ref'd). However, as discussed above, the complainant in *Thomas* made false accusations of rape or attempted rape in the months prior to

claiming that she had been raped by the defendant. *Id.* at 421-23.

*Billodeau*, 263 S.W.3d at 326 (emphasis in original). The court of appeals affirmed his conviction.

## Standard of Review

We review a trial court's ruling under the Rules of Evidence for an abuse of discretion. *Page v. State*, 213 S.W.3d 332, 337 (Tex. Crim. App. 2006) (quoting *Sauceda v. State*, 129 S.W.3d 116, 120 (Tex. Crim. App. 2004)). We consider the ruling in light of what was before the trial court at the time the ruling was made and uphold the trial court's judgment if it lies within the zone of reasonable disagreement. *Rodgers v. State*, 205 S.W.3d 525, 529 (Tex. Crim. App. 2006) (quoting *Weatherred v. State*, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000)).

## Rule of Evidence 608(b)

Rule of Evidence 608(b) provides that a witness's credibility may not be impeached with specific instances of the witness's conduct other than a criminal conviction as provided in Rule 609(a). TEX. R. EVID. 608(b). Nonetheless, this Court has acknowledged that the Confrontation Clause of the Sixth Amendment may require admission of evidence that Rule 608(b) would otherwise bar. *See Lopez*, 18 S.W.3d at 225.

## Rule 613(b)

Rule of Evidence 613(b), which creates an exception to Rule 608(b), provides that a witness may be impeached by using extrinsic evidence to show bias or interest.

> In impeaching a witness by proof of circumstances or statements showing bias or interest on the part of such witness, and before further cross-examination concerning, or extrinsic evidence of, such bias or interest may be allowed, . . . the witness must be given an opportunity to explain or to deny such circumstances or statement. . . . If the witness unequivocally admits such bias or interest, extrinsic evidence of same shall not be admitted. A party shall be permitted to present evidence rebutting any evidence impeaching one of said party's witnesses on grounds of bias or interest.

TEX. R. EVID. 613(b).

Relevant facts that occurred before the witness testifies at trial are admissible if permitted by the Rules of Evidence or the Confrontation Clause. A witness's credibility does not escape scrutiny because he can be shown to have displayed the unprincipled qualities of his character only after the date of the charged offense. The fact that the complainant allegedly made such threats *after* accusing appellant of molestation is not dispositive. If it were so, the first person about whom a complainant lied would be rendered unable to challenge the complainant's credibility and reputation for truthfulness even if the complainant had since been shown to be a veritable Pinocchio.

**Analysis**

On petition to this Court, appellant asserts that the Confrontation Clause of the Sixth Amendment guarantees him the right to confront J.B. about the subsequent false allegations. Appellant asserts that, because the only direct evidence of the offense was the testimony of J.B., the Klines' testimony was highly probative and that the trial court erred in denying its admission on the basis that the threats occurred after the charged offense. The state responds that the testimony was not probative because it did not involve the complainant's credibility at the time of the offense and that the excluded evidence did not entail "proven accusations or allegations similar to the accused offense." The state also asserts that, in light of the remoteness in time and dissimilarity of facts between the charged offense and the alleged threats towards the Klines, their testimony had little, if any, probative value regarding J.B.'s credibility at the time of the present offense.

We point out that, in *Lopez,* the extraneous offense–an alleged non-sexual assault on the complainant by the complainant's mother–was significantly different from the charged offense of

sexual assault of a child, and that the holding of *Lopez* is not based entirely on the truthfulness of the accusations, but also on the dissimilarity of them. *Lopez* at 226. Here, the trial court prevented appellant from proving the falsity of the accusations, even though J.B.'s accusation against appellant, and his threatened allegations against the Klines, were the same–molestation.

The court of appeals conducted a detailed analysis pursuant to the *Lopez* guidelines. However, the trial court in this case did not use the principles articulated in *Lopez* to determine whether it should admit the evidence. Instead, it based its reasoning on a single fact–the threats of making a false accusation occurred *after* the charged offense.

> [Defense counsel]: I have witnesses, . . . Nancy Kline, Matthew Kline, and Nathan Kline, all of whom are going to be brought forward to impeach the testimony of [J.B.]. All on the issue–specific to the issue of what the child's credibility is. And they will all say that he did, in fact, make those accusations that I asked [J.B.] about. For those reasons, both as a matter of credibility and under the Confrontation Clause of the United States Constitution, . . . I believe that it is, both, relevant material[ly] . . . and for a trier of fact to be able to make a rational decision about the credibility of an individual.
>
>       . . .
>
> [Trial Court]: Now, when is it that your witnesses are going to say that statement occurred?
>
> [Defense counsel]: The times that I just put into the record, Judge. Summer of 2004, which [J.B.] agreed to.
>
> [Trial Court]: Okay. And that would be a year after the alleged conduct in this case, correct?
>
> [Defense counsel]: Yes, sir.
>
> [Trial Court]: All right. Go ahead.
>
> [Defense counsel]: And the other one occurred this year. That was Nancy Kline.
>
>       . . .

[Trial Court]: Okay. I'm going to deny it if you can't show me a case that says you're entitled to that. You got [J.B.] for cross-examination purposes as to these events. You were specific in your arguments to the Court you don't want anything else to come in, but now you're going to leap forward to bring in other conduct of the complainant without even bringing in conduct of the defendant within a seven-day period. So you're going to need to bring me a case to show me that you can do that or the answer is no.

[Defense counsel]: Well, Judge, I think the primary difference is that [J.B.] is not the defendant in this case. So since he's not the defendant in this case and he is the person who is making and leveling the accusations, then his credibility is at issue both [sic] at the time that he made those accusations. And it also shows his propensity towards making allegations of sexual molestation whenever he gets mad at somebody.

[Trial Court]: Okay.

[Defense counsel]: And I think that's something that a juror would find helpful in making [a] determination with reference to credibility.

[Trial Court]: Okay. All that you need to do is find me a case that says that and I'll let it in.

While cross-examining the Klines during the bill of exception, the state raised only one issue with both Nancy and Nathan Kline:

[State]: Ms. Kline, both of these occasions that Mr. Barr has discussed with you happened after the police had come out to investigate and talked to the Bass family in late July of 2003?

[Ms. Kline]: Yes.

[State]: That's all, Your Honor.

. . .

[State]: Mr. Kline, just to clarify, this was in about November of 2004, correct?

[Nathan Kline]: About a year ago.

[State]: About a year ago?

[Nathan Kline]:  Yes.

[State]:  This would be after the time that the police came out to the park to talk to the Bass family about what happened?

[Nathan Kline]:  Yes.

[State]:  Nothing further, Judge.

In many sexual-assault cases, the only evidence linking the accused to the offense is the complainant's accusations.  That is true here.  While the court of appeals agreed with the trial court that the testimony of the Klines was not probative of the complainant's credibility at time of the charged offense, this is a misunderstanding of when a witness's credibility is relevant.

The court of appeals interpreted *Lopez* to require appellant to show that the false threats occurred before the offense at issue, but this interpretation is inconsistent with case law from this Court and the Supreme Court.  Both Courts have indicated that a witness's action that occurred after the indicted offense, but before trial, is admissible to show a bias or motive.  *See Alford*, 282 U.S. at 682[14]; *Maxwell v. State,* 48 S.W.3d 196, 200 (Tex. Crim. App. 2001)(witness's deferred adjudication assessed after charged offense admissible as impeachment); *see also Moreno v. State*, 22 S.W.3d 482, 486 (Tex. Crim. App. 1999) (evidence involving unadjudicated crimes or a pending criminal charge could be admissible to show a witness's bias or interest in the particular case);

---

[14]  The trial court in *Alford* had prohibited defense counsel from asking the defendant's former employee about his current address–a federal detention facility.

> Cross-examination of a witness is a matter of right. Its permissible purposes, among others, are that the witness may be identified with his community so that independent testimony may be sought and offered of his reputation for veracity in his own neighborhood; that the jury may interpret his testimony in the light reflected upon it by knowledge of his environment; and that facts may be brought out tending to discredit the witness by showing that his testimony in chief was untrue or biased.

*Alford*, 282 U.S. at 692.

*Carroll* at 498 (defendant should have been permitted to cross-examine the state's witness regarding his pending charges to demonstrate the witness's potential motive, bias, or interest to testify for the state); *Evans v. State*, 519 S.W.2d 868, 873 (Tex. Crim. App. 1975) (defendants were denied the right of effective cross-examination when prohibited from cross-examining a state's witness about his pending charge of sodomy).

In this case, there was testimony that J.B. had suffered from mental illness since the age of four and that the mental illness contributed to his acts of rage and anger. J.B. testified that he had become angry when appellant took back J.B.'s remote-control cars, and that, the very next day, he accused appellant of molesting him.[15] The record shows that, while angry about perceived injustices, J.B. both accused appellant of molestation and threatened to accuse the Klines of molestation. Consequently, the fact-finder might have found the Klines' testimony helpful in deciphering whether the incident regarding the remote-control cars contributed to the sexual-assault accusations against appellant.

The possible animus, motive, or ill will of a prosecution witness who testifies against the

---

[15] At trial, J.B. testified about his anger.

> [Defense]: Okay. All right. Now, you told us that sometimes you get sort of mad; is that right?
>
> [J.B.]: Yes.
>
> [Defense]: Okay. And you were mad when he took your toy away from you right, right?
>
> [J.B.]: Yeah.
>
> [Defense]: Okay. How long was it after he took the toy away that you talked to Marilyn Jordan?
>
> [J.B.]: The next day.

defendant is never a collateral or irrelevant inquiry, and the defendant is entitled, subject to reasonable restrictions, to show any relevant fact that might tend to establish ill feeling, bias, motive, interest, or animus on the part of any witness testifying against him. *London v. State*, 739 S.W.2d 842, 846 (Tex. Crim. App. 1987); Texas Rule of Evidence 613(b). It was immaterial in this case that the alleged false threats occurred before J.B. accused appellant or after; both periods may be used to evaluate J.B.'s bias, motive, or ill feelings towards appellant, and thereby, his credibility. TEXAS RULE OF EVIDENCE 613(b). The trial court abused its discretion by denying appellant the opportunity to cross-examine J.B. about the threats against the Klines, thus preventing appellant from presenting admissible evidence–the rebutting testimony of the Klines–to show J.B.'s possible motive for accusing appellant of sexual molestation.

This error is non-constitutional, so we analyze harm under Rule of Appellate Procedure 44.2(b): "Any other error, defect, irregularity, or variance that does not affect substantial rights must be disregarded." Appellant was entitled by Rule 613(b) to cross-examine J.B. about the false threats he had made against the Klines, in order to show J.B.'s motive to testify untruthfully and to present to the jury J.B.'s denials. Once J.B. had denied making the threats, appellant was entitled to present the Klines' rebutting testimony about J.B.'s threats to falsely accuse them of molestation, thus enabling the jury to use the testimony of all three witnesses in weighing J.B.'s credibility. Because appellant was not permitted to do so, he was unable to present any evidence of J.B.'s purported motive to fabricate allegations of sexual molestation. We find that the inability to fully present his defense affected a substantial right and is therefore harmful error.

The judgment of the court of appeals is reversed, and the cause is remanded to the trial court for a new trial.

Delivered: February 11, 2009
Publish