In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-14-00247-CR
_____

EBONY KEIWANA LIVING, Appellant

V.

THE STATE OF TEXAS, Appellee

_____

On Appeal from the County Court at Law No. 2,
Jefferson County, Texas
Trial Cause No. 293812
_____

MEMORANDUM OPINION

Appellant, Ebony Keiwana Living (Living), was charged by information with terroristic threat, a class A misdemeanor. Tex. Penal Code § 22.07 (West 2011). Living entered a plea of not guilty and the cause went to trial by jury. On April 3, 2014, the jury found Living guilty. The trial court sentenced Living to 180 days of confinement, suspended imposition of sentence, and placed her on community supervision for two years. Living filed an appeal wherein she asserts

1

one issue challenging the trial court's admission into evidence of an audio recording of a 9-1-1 call relating to the incident in question. We overrule her issue and affirm the judgment of conviction.

UNDERLYING FACTS

The bill of information charged Living with making a terroristic threat on Matilda Royal (Royal) on May 31, 2012, when Living "did then and there unlawfully and with intent to place [] Royal . . . in fear of imminent serious bodily injury, threaten to commit an offense involving violence to [Royal], namely, to kill [Royal]." According to Royal, who testified at trial, Royal is in an ongoing relationship with Brian Celestine (Celestine). Celestine and Living were previously in a relationship and they have a child together.

Royal testified that she first began dating Celestine in 2011. On May 31, 2013, Royal and Celestine were leaving a church carnival and decided to drive to see T.J., one of Celestine's friends who is also Living's cousin. When they arrived at T.J.'s, Royal stayed in the vehicle. Celestine stood outside and talked to T.J. Royal then saw Living's vehicle approaching from the other direction. Living stopped her vehicle and Living's child jumped out of Living's vehicle and ran over to hug Celestine. Royal stated she could hear Living talking on her phone and calling Royal names. Royal called out to Celestine to tell him they needed to go

2

because Royal did not want a confrontation. Celestine returned to his vehicle and he and Royal drove away. Living then began backing up her vehicle "real fast." Celestine drove away and Living followed. Living drove her vehicle up beside Celestine and Royal's vehicle and Living began throwing things out her window at Royal. Royal testified that Living threw a "perfume bottle, mace can, beer can, anything that she [could] grab out of her car." Celestine pulled up to the store, and Living also pulled up at that time. Celestine and Royal then drove away and Living followed, "[s]till reckless, on the bumper, on the side, speeding as much to get on the side of us to show us, you know, what she had in the car and to say what she was going to do." According to Royal, Living verbally made threats saying "[s]he would kill" Royal, [s]he would "beat [Royal's] A, and so forth and so on."

As Celestine and Royal were trying to get away from Living, Royal placed a 9-1-1 call, and Royal told the 9-1-1 operator the street they were on and what Living was doing. The car chase continued. Living drove past Royal's car and turned in front of Royal's car to block Celestine and Royal from going forward, and they were blocked in because another vehicle was behind them. Even though Royal's window was up, she stated that she could still hear Living making threats. Living got out of Living's vehicle and approached Royal's car. Living had a gun in her hand and began beating on the glass of Royal's car with the gun. At that point,

Royal was still on the phone with the 9-1-1 operator, relaying information. Royal testified that eventually, Living walked away yelling and screaming, "she could go to jail today[,] [s]he didn't care." Royal testified that she was scared and she believed that Living was serious and capable of carrying out her threat.

Royal further explained to the jury that she had other incidents with Living. The first incident she described occurred in 2011, shortly after Royal began dating Celestine. Living appeared outside Royal's house while Celestine was there, and Living shouted obscenities at Royal from the street. Royal called the police about the incident, but according to Royal the district attorney did not have enough evidence and refused to prosecute. Royal recalled another incident, when Living yelled at Royal and called her "the B word" while they were both attending a function at an elementary school. Royal also recalled an incident where she "ran into" Living at a store. Royal and Celestine were going to shop at a convenience store, and Royal was driving. Living blocked Royal's vehicle, and she "jumped out of her car" with a sledgehammer. Royal again filed a police report.

Brian Celestine testified that Living is the mother of his eight-year-old child, that Celestine and Living were in a relationship for about fourteen years, and they ended the relationship "[a]bout four" years before trial. Celestine recalled the evening of May 31, 2012, when he was visiting with his friend, and Living pulled

up in her car. Celestine decided to leave because Living was "fussing, [and] arguing." Living followed. They drove through a residential area where other people were also walking and driving. Celestine recalled Living cut them off, blocked them in, and Living was "fussing, yelling, saying all kind of stuff," "yelling, cursing," "threats and stuff." Celestine said that Living had something with her, "Probably -- I think a gun. Yeah, she had a gun -- and a -- a -- I don't know. . . . She had -- it was -- I don't know, it was an axe -- I don't know . . . what it was. I don't know, was on a stick. I don't know." Celestine testified that Living had acted out on threats to him before and that she "cut" him. On cross-examination, Celestine admitted that at the time of the May incident that Living had a protective order issued to protect Living from Celestine.

Officer Crystal Holmes testified that she is a detective for the Beaumont Police Department, and she was assigned to investigate the incident. Holmes interviewed the complaining witness, Royal, and she also interviewed the defendant, Living. Holmes gathered evidence, including the tape of the 9-1-1 call. On direct examination of Holmes, the State asked Holmes if she had "form[ed] an opinion as to what happened" the day of this incident. Holmes testified that, based on the statements she took and the audio of the 9-1-1 call, in her opinion "the disturbance occurred and the threat occurred." At some point the State sought to

5

admit the recording of the 9-1-1 call and Living's Attorney objected based on a lack of a proper predicate. The trial court allowed the Defense Attorney to voir dire the witness and the following exchange occurred:

Q. When you requested this recording, do you know whether or not the recording device was accurate or not or working properly the night this happened? Do you have any personal knowledge of that.

A. No, sir.

Q. Do you know whether or not this has been altered in any way, because you didn't do this recording; correct?

A. No, that is the recording I received from the supervisor in dispatch.

Q. But you don't know what the supervisor did or didn't do in recording this?

A. No, sir.

Q. And again, you -- that is not your job description. You're a detective; is that correct?

A. Yes, sir; that's correct.

Q. And you just made a request to another individual; and this is what you received and nothing else?

A. Correct.

Q. So, you don't know whether or not the machine was working, if they had problems or anything; nothing was ever disclosed to you?

A. No, sir.

Later, during the continued testimony of Officer Holmes, Holmes testified about her interviews with Royal and Living. She also explained how she obtained the recording of the 9-1-1 call and that she could personally identify the voice of Royal and Living on the audio tape. At that point, the State renewed its request that the trial court admit the recording of the 9-1-1 call into evidence:

[State's Attorney]: Your Honor, we ask to admit the recording at this time.

[THE COURT]: Yes, you can admit -- that is State's Exhibit No. 1; and I assume that the defense's objection is still proper predicate hasn't been laid; right?

[Defense Attorney]: And a bunch of -- and all the other ones, Judge.

[THE COURT]: Okay. Overruled. You can --

[State's Attorney]: Publish?

[THE COURT]: -- publish to the jury.

[State's Attorney]: Thank you, Your Honor.

(AUDIO TAPE PUBLISHED TO THE JURY.)

Officer Shawn Tolley also testified. Tolley was dispatched to respond to a disturbance on the evening of May 31, 2012. Tolley and another officer, Officer Butler, responded to a call about a disturbance and they met the complaining witness in a church parking lot. They learned from the complaining witness that the suspect was Ebony Living. The complaining witness actually pointed out

7

Living's vehicle. Officer Tolley stopped the vehicle being driven by the suspect who identified herself as Ebony Living. Tolley questioned Living about the disturbance. Living told Officer Tolley that "[Living] was involved in this disturbance with this other lady and it had to do with [Living's] ex-boyfriend or father of her child and that the other lady had threatened [Living] with pepper spray and possibly sprayed it at her." Tolley could not recall seeing any evidence of pepper spray on Living or Living's car. According to Officer Tolley's report, Living told the officer that Royal ran out in the street in front of Living's car. Officer Tolley was unable to collect any evidence allegedly thrown from Living's car.

On cross-examination Officer Tolley admitted that when Tolley pursued Living's vehicle that Living appeared to be doing the speed limit. Tolley did not observe Living make any sharp turns or "avertive movements." Further, Living gave consent for the officer to search the vehicle. Tolley believed he did a thorough search. Officer Tolley further agreed that Celestine was to appear in court in June 2011 on a felony violation of a protective order involving Living. Officer Tolley agreed that Living told Officer Tolley that Living believed Celestine and Celestine's girlfriend Royal were trying to give Living "a hard time" or get her in trouble because of the upcoming court date.

Earl Oster, an employee with the Beaumont 9-1-1 Center, also testified. Oster testified that he was working at the 9-1-1 Center on the evening of May 31, 2012, that he recognized State's Exhibit Number 1 as the disc of the recorded 9-1-1 call from that evening, that he listened to the recording, that the recording was prepared on a device capable of making an accurate recording, that the recording was originally saved on a hard drive but then presented into evidence on CD, that the operator was competent to operate the device and make the recording, and that the recording is an accurate representation of the conversations and statements that took place, that the audio recording had not been altered in any manner, that he could identify the voices on the recording, that the recording was made on the night of the event, and that he was the call taker on the tape. On cross-examination, Oster admitted that he did not know Royal personally, but he confirmed he was the person who took the call. Living did not testify.

The jury returned a unanimous verdict of "guilty." Living elected to have the trial judge assess punishment, and after hearing additional evidence and testimony from Living, the trial court sentenced Living to 180 days of confinement, but suspended the imposition of the sentence and placed her on community supervision for two years.

ISSUE PRESENTED ON APPEAL

The only issue raised by Living on appeal is "[w]hether the trial court erred by allowing an audio tape into evidence under Rule 90.1[sic] Texas Rules of Evidence."

STANDARD OF REVIEW

We review the trial court's decision to admit evidence under an abuse of discretion standard. *See Billodeau v. State*, 277 S.W.3d 34, 39 (Tex. Crim. App. 2009). A reviewing court should not reverse a trial court's decision to admit the evidence absent a clear abuse of discretion. *McCarty v. State*, 257 S.W.3d 238, 239 (Tex. Crim. App. 2008). The test for abuse of discretion is whether the trial court acted without reference to any guiding rules or principles. *Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010). The trial court abuses its discretion when its ruling is arbitrary, unreasonable, or without reference to any guiding rules or principles. *Lyles v. State*, 850 S.W.2d 497, 502 (Tex. Crim. App. 1993). The trial court does not abuse its discretion unless its determination lies outside the zone of reasonable disagreement. *Martinez*, 327 S.W.3d at 736.

ANALYSIS

According to Living, the jury should not have been allowed to hear the tape recording because Officer Holmes had no personal knowledge of whether the

10

recording device was accurate, whether the recording had been altered, and she was not the custodian of the record for the police department. Therefore, Living argues Holmes could not authenticate the tape recording.

To support her argument, appellant cited the Court to *Edwards v. State*, 551 S.W.2d 731, 733 (Tex. Crim. App. 1977). In *Edwards*, the Texas Court of Criminal Appeals applied seven criteria to the admission into evidence of a sound recording. However, the seven-part *Edwards* test was superseded by the adoption of the Texas Rules of Evidence. *See Martinez v. State*, 371 S.W.3d 232, 243 (Tex. App.—Houston [1st Dist.] 2011, no pet.). The Texas Court of Criminal Appeals has stated that the *Edwards* test is no longer the standard that applies. *See Angleton v. State*, 971 S.W.2d 65, 68-69 (Tex. Crim. App. 1998) (overruling in part *Kephart v. State*, 875 S.W.2d 319 (Tex. Crim. App. 1994), and holding that Rule 901 is "straightforward, containing clear language and understandable illustrations," and it is inconsistent with the pre-rules authentication requirements.)). Rather, Rule 901 states that "the requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Tex. R. Evid. 901(a). Several non-exclusive illustrations are provided in Rule 901(b), including but not

11

limited to testimony of a witness with knowledge, voice identification, and evidence of a process used to produce a result.

Although Officer Holmes could not state whether the recording device was accurate or working properly, or whether it had been altered in any way, she testified about the process she used to request the audio recording from the 9-1-1 Call Center, she stated that she recognized the voices on the audio recording, and she confirmed that the date of the recording and details matched the information she obtained when she conducted her investigation of the incident. The trial court then admitted the audio recording into the record. Thereafter, the State called another witness, the person who took the call at the 9-1-1 Center, and he testified that he recognized the State's Exhibit Number 1 as the disc of the recorded 9-1-1 call from that evening, that he had listened to the recording, that the recording was prepared on a device capable of making an accurate recording, that the recording was originally saved on a hard drive and then offered into evidence on a CD, that the operator was competent to operate the device and make the recording, that the recording is an accurate representation of the conversations and statements that took place, that the audio recording had not been altered in any manner, that he could identify the voices on the recording, that the recording was made on the night of the event, and that he was the call taker on the tape. Therefore, we

12

conclude that the trial court did not abuse its discretion in ruling that the audio tape was properly authenticated and in admitting the tape into evidence.

Even assuming the trial court erred in admitting the audio recording, we would be required to conduct a harm analysis to determine whether the error, if any, requires reversal of the judgment. *See* Tex. R. App. P. 44.2. If the error is constitutional, we apply Rule 44.2(a) and reverse unless we determine "beyond a reasonable doubt that the error did not contribute to the conviction or punishment." Tex. R. App. P. 44.2(a). Otherwise, we apply Rule 44.2(b) and disregard an error unless it affects substantial rights. Tex. R. App. P. 44.2(b). Living does not argue that the admission of the 9-1-1 recording implicated her constitutional rights.[1]

The record before us indicates that other evidence was admitted about the 9-1-1 call from not just Officer Holmes and Oster, but also through the testimony of the complaining witness which established that Royal made a 9-1-1 call and outlined the details of the evening in a manner that was consistent with the details of the 9-1-1 recording. The recording of the 9-1-1 call was therefore cumulative of other evidence. The erroneous admission of evidence that is otherwise cumulative

---

[1]Rarely do erroneous evidentiary rulings rise to the level of constitutional error. *Potier v. State*, 68 S.W.3d 657, 663 (Tex. Crim. App. 2002); *Stovall v. State*, 140 S.W.3d 712, 718 (Tex. App.—Tyler 2004, no pet.) ("A violation of the evidentiary rules that results in the erroneous admission of evidence is nonconstitutional error.").

of other properly admitted evidence pertaining to the same facts is harmless. *Brooks v. State*, 990 S.W.2d 278, 287 (Tex. Crim. App. 1999) (en banc); *Eggert v. State*, 395 S.W.3d 240, 244 (Tex. App.—San Antonio 2012, no pet.). After examining the entire record, we have fair assurance that any error in admitting the recording of the 9-1-1 call did not influence the jury or had but a slight effect, and it was therefore harmless. *Taylor v. State*, 268 S.W.3d 571, 592 (Tex. Crim. App. 2008).

Living restates her argument in her Brief "that the proper precedent was not established by the State to allow the tape to be entered into evidence [][and] the tape should not have been allowed based on relevance and the State failed to give proper notice pursuant to Rule 902(10) Texas Rules of Evidence (Business Records)." Living failed to preserve any argument pertaining to the "relevance" of the tape because that objection was not made during the trial. *See* Tex. R. App. P. 33.1. As to her contention that the State failed to give proper notice pursuant to Rule 902(10), she has failed to brief the issue on appeal. *See* Tex. R. App. P. 38.1. Additionally, we note that Rule 902(10) pertains to business records accompanied by affidavit, and the State used live testimony from Officer Holmes and from Oster, the 9-1-1 call taker, to testify about the authenticity of the recording, consistent with the examples provided in Rule 901(b).

Therefore, we overrule the issue raised by Living, and we affirm the trial court's judgment.

AFFIRMED.

_____
LEANNE JOHNSON
Justice

Submitted on June 2, 2015
Opinion Delivered June 24, 2015

Before McKeithen, C.J., Horton, and Johnson, JJ.

15