**Affirmed and Memorandum Opinion filed April 30, 2019.**



In The

# Fourteenth Court of Appeals

## NO. 14-17-00559-CR

**LEONARD FARRELL WILLIS, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 405th District Court**
**Galveston County, Texas**
**Trial Court Cause No. 15-CR-1465**

## MEMORANDUM  OPINION

A jury convicted appellant, Leonard Farrell Willis, of sexual assault. Tex. Penal Code § 22.011. The State also alleged that appellant had been previously convicted of three felony offenses. At the conclusion of the punishment phase of the trial, the trial court found the enhancement paragraphs in the indictment true and assessed appellant's punishment at forty years in prison. *See id.* at § 12.42(d). In a single issue on appeal, appellant argues that the trial court abused its discretion when it sustained the State's objection under Texas Rule of Evidence 412 and

excluded evidence of the complainant's prior sexual behavior. *See* Tex. R. Evid. 412. We affirm.

**BACKGROUND**

Because appellant does not challenge the sufficiency of the evidence supporting his sexual assault conviction, we include only those facts necessary to address the single issue he raises in this appeal.

The complainant graduated from High Island High School in May, 2014. She would turn 18 later that summer. One of the complainant's friends was appellant's daughter. The complainant knew appellant as a result of the time she spent with his daughter.

On June 22, 2014, appellant began texting the complainant. Appellant's first text stated: "Hey sexy." This text was sent at 9:29 p.m. The complainant had never texted appellant before, and she did not know his telephone number. In fact, when appellant's first text arrived, the complainant did not know who was texting her. Appellant then sent a second text message, asking the complainant, "Wanna come play?" The following exchange then occurred:

Complainant:      "Who is this?"

Appellant:      "It's your friend."

Complainant:      "Who?"

Appellant:      "You just gave me a hug in the big store yesterday."

Appellant:      "You confused"

Appellant:      "Any way just wanted to say hi"

Complainant:      "A hug? In the big store? Who is this"

Appellant:      "This is [complainant?]"

2

Complainant:      "Yea?"

Appellant:        "Is this [complainant?]"

Complainant:      "Yea?"

Appellant:        "This is your bff's old man"

Appellant:        "Lol"

Complainant:      "Oh hi lol."

Appellant:        "Hi"

Appellant:        "So you wanna come play"

The complainant thought that this exchange was unusual because appellant was texting her, "Want to come play." Complainant was "a little grossed out" by the text messages. The complainant was not attracted to appellant in any way.

A short time later that same evening, appellant texted the complainant again.

Appellant:        "What's up?"

Appellant:        "Wyd"[1]

Complainant:      "I wish I could but I have to work tomorrow and it's my brother's first day."

The complainant did not have to work the next day. This was her way of refusing appellant's offer to come play with him, which she did not want to do. Appellant then texted, "Oh, ok. We'll [sic] be good. Where you working." The complainant responded with the name of a particular bar in Crystal Beach. Appellant then texted the following:

Appellant:        "I have to take my father to the heart dr tomorrow"

_____

[1] According to the complainant, "wyd" means "what are you doing."

Appellant:          "Ok then"

Appellant:          "Night"

Appellant:          "Didn't mean no harm.  Sorry."

The complainant did not respond to these final text messages.

This text message exchange frightened the complainant, so she contacted Brian, her ex-boyfriend, to help her block appellant's telephone number.  The complainant texted Brian that appellant's daughter "gave my number to her dad. He keeps asking me to party with him."  She showed Brian the text messages that appellant had sent to her, and Brian agreed they were inappropriate, and that the complainant should block his number.  Brian blocked appellant's number from again reaching the complainant's phone.

The complainant then contacted appellant's daughter and asked if she had given appellant her telephone number.  Appellant's daughter apologized for what appellant had texted to the complainant.  Appellant's daughter told the complainant that appellant was sorry, and that he did not mean it.  While this incident did not harm the complainant's friendship with appellant's daughter, the complainant did spend less time at appellant's residence after it occurred.  On one occasion, the complainant did go to appellant's residence so that she could go swimming with appellant's daughter.  On this occasion, when appellant saw the complainant, he told her that she was pretty.  This made the complainant feel uncomfortable.  Since appellant had apologized for the previous texts he had sent, the complainant brushed the comment off.

Later that year, the complainant and some of her friends were attending the Rice Festival in Winnie.  After attending the festival, the group travelled to a cabin in east Texas owned by the family of one member of the group.  The group began

4

drinking heavily and the complainant became very intoxicated. The complainant eventually went to the bathroom and vomited for an extended period-of-time. The complainant testified that she had never gotten this intoxicated before. It was also the first time that she got so intoxicated that she did not remember everything that had occurred. Another of the complainant's friends was helping the complainant in the bathroom when appellant's daughter got upset because she wanted to be the one to help the complainant. The two friends got into a violent fight as a result of this dispute.

After the fight, a member of the group told appellant's daughter and her boyfriend, Anthony, that they had to leave the cabin. Appellant's daughter took the intoxicated complainant with her because they were best friends. Appellant's daughter got the complainant into the back seat of her car and the complainant fell asleep. The complainant did not know where appellant's daughter was taking her, but she had assumed that they were driving to appellant's daughter's trailer as they had done in the past. But, when they reached their destination, appellant's daughter got the complainant out of the vehicle and helped her upstairs at appellant's Crystal Beach residence. Appellant's daughter told the complainant, "Shhh, my dad is sleeping. I need you to be quiet." Appellant's daughter and Anthony got the complainant into a bed in a guest room and she fell asleep. The complainant testified that she did not take her clothes off when she got into bed. The complainant remained very intoxicated.

The next thing the complainant remembered was that she woke up, her clothes were off, and appellant was on top of her. The complainant did not immediately know who was on top of her. Appellant's penis was inside the complainant's vagina. The complainant was scared, and she did not say or do anything. After appellant was finished, he went to the bathroom and returned with

5

a wash cloth and told the complainant to wash up. By this time, the complainant realized who her attacker was, and she just wanted to get away. The complainant testified that she did not give appellant consent to enter her room nor to have sex with her. When the complainant was asked if she might have consented as a result of the alcohol she had consumed, she responded, "No, ma'am. He was a friend's dad. That was just gross."

After tossing the wash cloth to the complainant, appellant left the room and went into another room. At that point, the complainant grabbed her clothes and put them back on. The complainant's cell phone was still in appellant's daughter's vehicle, so she went outside and then downstairs to get her phone so that she could call a friend to pick her up. When the complainant retrieved her phone, she discovered that its battery was dead. Appellant came outside at that point and asked the complainant if her phone was dead and needed to be charged. When the complainant told him yes, appellant took the phone into the kitchen and plugged it in to charge. The complainant remained outside on the porch. The complainant began smoking a cigarette and appellant came outside and said that she could smoke inside and watch television if she wished. The complainant remained outside on the porch. The complainant testified that she did not want to be in the same room with appellant.

After a while, the television went off and the complainant realized that appellant had left the living room. At that point, the complainant went back inside the house to get her phone. It was approximately 5:00 in the morning when the complainant retrieved her phone. She then walked to a nearby real estate leasing office and began calling people get Brian, or someone else, to pick her up. The complainant also texted one of Brian's roommates, telling him, "please wake up and have Brian come get me please. I'm begging you. Something bad just

6

happened."

The complainant briefly thought about calling the police, but she did not want to do that at the time because "[e]verybody on the island would hate me." The complainant "just wanted it to go away." The complainant was also scared to call the police because appellant's family was friends with one of the Galveston County Sheriff's deputies who regularly patrolled Bolivar Peninsula. Appellant's daughter often would stop and talk to this deputy when they would see him on the beach.

The complainant continued to call people. Eventually, Brian realized that his roommates' phones had been ringing repeatedly. Checking his roommate's phone, Brian discovered that the complainant had been trying to reach him. By text, Brian asked the complainant what had happened. The complainant responded, "Come get me, please." Brian then called the complainant and told her to wait and he would be there to pick her up. Brian described the complainant as "[s]haken, anxious, real jittery, she could barely speak." The complainant waited at the real estate office for Brian. Brian and one of his roommates, Dory, eventually arrived at the real estate office. When they saw the complainant, Brian put her in his truck. The complainant "was crying really, really hard. And so I just tried to understand what she was trying to say." Brian had never seen the complainant that shaken up before. The complainant told Brian that something bad had happened, that appellant had raped her, and that she wanted Brian to take her home.

Instead of driving complainant home, Brian drove to appellant's residence to confront appellant. The complainant, who just wanted to go home, initially remained in Brian's truck when they reached appellant's residence. Brian and Dory went up to appellant's residence and repeatedly knocked on the door and

windows of the residence. Appellant eventually answered the door. Brian asked appellant what had happened with the complainant, and appellant said that he did not know what Brian was talking about. A confrontation ensued between Brian and Dory on one side, and appellant, appellant's daughter, and her boyfriend Anthony on the other, with the complainant caught in the middle.

Appellant's daughter called the police. At this point, the complainant, appellant's daughter, Anthony, and appellant were all on appellant's front porch. Anthony continued to yell at Brian and Dory to get off the property. Appellant's daughter wanted the complainant to tell the police that nothing had happened. After a while during the continuing argument, the complainant eventually said, "I'll say nothing happened. Just let me leave." The complainant said this because she wanted to go home. Appellant's daughter told the complainant, "[p]lease, I'm begging you. This is my dad." The complainant tried to climb over the gate to leave the property, but appellant's daughter grabbed the complainant's hand and prevented her from leaving.

Brian called his uncle, Constable William Comeaux.[2] When Brian told Constable Comeaux that the police had been called, Constable Comeaux told Brian that he needed to leave. After talking with Constable Comeaux, Brian told the complainant that he had to go home and that he could not wait. Brian and Dory left the residence, leaving the complainant at appellant's residence. After talking to Brian, Constable Comeaux called Deputy Robert Dodd with the Galveston County Sheriff's Office. Constable Comeaux told Deputy Dodd that Brian had expressed concern that the complainant was being held at appellant's residence against her will.

Deputy Dodd was called to appellant's residence because of "[a] trespass of

---

[2] Comeaux was the elected constable for this part of Galveston County.

subject being on location, creating a disturbance, that had been asked to leave, that wouldn't leave." After he arrived at appellant's residence, Deputy Dodd asked where Brian was because he was the person supposedly causing the disturbance. Appellant's daughter told him that Brian had already left. Deputy Dodd testified that no one wanted to press charges against Brian. Deputy Dodd saw the complainant as well, and he observed her to be "[q]uiet, very reserved with – almost withdrawn." Based upon the officer's training and experience, the complainant was acting like other assault victims he had encountered in the past. The complainant testified during appellant's trial that she did not feel comfortable speaking with Deputy Dodd because he was a good friend of appellant and his family. The complainant testified that she did not believe Deputy Dodd would do anything to help her. As a result, she told the deputy nothing had happened, that she had called Brian, and that he had just been there to pick her up. When appellant's trial attorney asked the complainant if she was suggesting that the deputy would cover up a rape, the complainant responded, "I'm saying I was scared." After he left the scene, Deputy Dodd contacted Constable Comeaux and told him that the complainant told him that she was not being held against her will.

The complainant eventually asked appellant's daughter to take her home. Appellant's daughter and Anthony then drove her home. When they dropped the complainant off, her parents were not home. While initially unsure about what to do, the complainant contacted the police that same day, and she decided to press charges against appellant. The State charged appellant with the felony offense of sexual assault.

During his trial, appellant sought to introduce evidence that the complainant allegedly fabricated a sexual assault claim against a foreign exchange student when she was thirteen or fourteen years old. In appellant's view, this evidence of an

9

allegedly false prior sexual assault allegation was admissible because it established a motive to lie about having consented to sex with appellant. The trial court sustained the State's Rule 412 objection and excluded the proffered evidence. *See* Tex. R. Evid. 412. The trial court allowed appellant to make a bill-of-exception and the excluded evidence is contained in the appellate record.

During the bill-of-exception hearing, the complainant testified that she told the detective investigating the sexual assault allegation against appellant that the reason she did not say no to appellant was because she had been raped in the past. The complainant told the detective that, when she was thirteen or fourteen and attending high school in Oklahoma, a foreign exchange student had raped her. The complainant told the detective that she did not tell anyone about the rape by the foreign exchange student. The complainant also told the detective that she did not say no or fight back when appellant was assaulting her because the foreign exchange student had beaten her during the prior incident. The complainant said the previous rape occurred during a party at a friend's house.

The complainant also told the detective that a friend found her in a ditch on the morning after the rape. The complainant testified during the bill-of-exception hearing however, that her friend did not find her in a ditch, but that she had walked to the friend's house after she initially had fled and taken refuge in a ditch. The complainant further told the detective that she was wearing only a bra and sweatpants when her friend found her, and her friend asked her what happened. The complainant told her friend that she did not want to talk about it. Her friend acceded to that request, and no one made her speak about the incident again. When asked during the bill-of-exception hearing, the complainant agreed that she had told the investigating detective that three or four months after the Oklahoma rape, her parents made her go to counseling in lieu of medication because they

thought she was depressed. During the hearing, the complainant agreed that she also told the investigating detective that she kept a diary as part of that counseling, that her parents found the diary, and learned about the rape as a result. Finally, the complainant told the detective that, by the time her parents found her diary, the foreign exchange student had already left the country.

The complainant testified during the bill-of-exception hearing that she began seeing a counselor in response to the rape by the foreign exchange student. But, as mentioned above, the complainant also had told the investigating detective that she actually started the counseling at the request of her parents because she was depressed, not because of the rape. The complainant testified that the counselor made her keep a diary. She also testified that her parents found the diary and then learned about the rape. According to the complainant her parents wanted to press charges against the foreign exchange student, but he had already left the country. When appellant's trial attorney suggested that the complainant's high school assailant was still in school at the time that she began her counseling, the complainant again testified that he already had left the country. But, the complainant later also testified that her assailant was still in school at that time. So, it was unclear in the complainant's bill-of-exception testimony when her high school assailant had returned to his home country. The complainant never, however, wavered in her assertion that the foreign exchange student had raped her.

In this bill-of-exception hearing, the appellant's trial attorney asked the complainant if she was Facebook friends with her high school assailant, and she responded, "[n]ot that I know of," and "I don't know if I'm still friends with him or not." When appellant's trial attorney asked her if she had "unfriended" him, she responded, "[n]ot that I remember." The complainant explained that she did not check all of her Facebook friends because she had thousands of them. When

11

appellant's trial attorney suggested that the complainant had added her assailant as a Facebook friend perhaps even after the rape, the complainant testified, "I do not remember. At that time I just added everybody. [ ] I just used to go down and just click 'confirm' on everyone."

When appellant's trial attorney suggested that the rape of the complainant was in fact only an attempted rape because the complainant had told her counselor that the complainant had called for help and that someone came to help, interrupting the rape. The complainant testified, "nobody came to help. My friend had walked in and asked me to put clothes on and walked out of the room. And he had went and sat on the bed while I put my clothes on and ran. I didn't even finish putting all my clothes on. My friends were all still there at the party. Appellant's attorney again suggested to the complainant that she had told her counselor that this rape was in fact only an attempted rape because the assailant was not able to get the complainant's clothes off before someone else came into the room where he was assaulting her. The complainant countered that, "my clothes were already off, sir."

During the bill-of-exception hearing, appellant argued that his offer of proof showed that the complainant had made a fabricated sexual assault claim, which he suggested was corroborated by the "fact" that the complainant remained Facebook friends with her alleged high school assailant. The trial court responded that "even the counselor in the records indicates a sexual or attempted sexual assault happening." The trial court continued that a "trial court is not required to admit evidence of proof of a prior false accusation when the accusation was never shown to be false to the satisfaction of the trial judge, and that hasn't been done, to me." Appellant's trial attorney then pointed out that appellant was also offering the testimony regarding the prior incident to prove the complainant's "motive or bias

12

under the confrontation clause" for making the accusation against appellant. The trial court rejected this argument as well.

The jury found appellant guilty as charged in the indictment. The case then proceeded to the punishment phase at the end of which the trial court sentenced appellant to serve forty years in prison. This appeal followed.

## ANALYSIS

In a single issue, appellant contends the trial court abused its discretion when it sustained the State's Rule 412 objection and excluded evidence regarding the prior sexual assault by a foreign exchange student. In appellant's view, the trial court abused its discretion when it excluded the evidence because it was admissible pursuant to his rights under the Confrontation Clause, and also because it demonstrates the complainant's bias against him or motive to lie as allowed by Rule 412(b)(2)(C) of the Texas Rules of Evidence. *See* U.S. Const. amend. VI.; Tex. R. Evid. 412. We disagree.

## I.  Standard of review and applicable law

We review a trial court's decision to admit or exclude evidence under an abuse-of-discretion standard; we will not reverse the decision if it is within the zone of reasonable disagreement. *Tillman v. State*, 354 S.W.3d 425, 435 (Tex. Crim. App. 2011). We must uphold the trial court's decision if it is reasonably supported by the record and correct under any theory of law applicable to the case. *Willover v. State*, 70 S.W.3d 841, 845 (Tex. Crim. App. 2002).

Texas Rule of Evidence 412, entitled "Evidence of Previous Sexual Conduct in Criminal Cases," prohibits the admission of evidence regarding a victim's previous sexual conduct unless it falls within one of five specified exceptions. Tex. R. Evid. 412. Only two of those exceptions are relevant here: (1) whether the

13

proffered evidence relates to the motive or bias of the alleged victim; and (2) whether admission of the evidence is constitutionally required. *See id.* at 412(b)(2)(C) & (E). Even if the proponent of the evidence of past sexual conduct can satisfy the burden to demonstrate the evidence's relevance and an applicable Rule 412 exception, the evidence of specific instances of past sexual behavior still must be excluded unless the probative value of the evidence outweighs the danger of unfair prejudice. *Id.* at 412(b)(3). In addition, unlike Rule 403 of the Texas Rules of Evidence, which embodies a presumption of admissibility of relevant evidence even if it has some potential for unfair prejudice, Rule 412(b)(3) tips the scale against the admissibility of such evidence. *See Robisheaux v. State*, 483 S.W.3d 205, 223–24 (Tex. App.—Austin 2016, pet. ref'd) (noting that the Rule 412 balancing test is more stringent than the Rule 403 balancing test and it weighs against admissibility).

Criminal defendants have a constitutionally-protected right to cross-examine witnesses. *Lopez v. State*, 18 S.W.3d 220, 222 (Tex. Crim. App. 2000). Whether there has been a violation of the Confrontation Clause is determined on a case-by-case basis. *Henley v. State*, 493 S.W.3d 77, 95 (Tex. Crim. App. 2016). To determine whether evidence must be admitted under the Confrontation Clause, a trial court must balance the defendant's right to cross-examine and the probative value of the proffered evidence against the risk factors associated with the evidence. *Id.* The trial court possesses broad discretion to impose reasonable limits on cross-examination to avoid harassment, prejudice, confusion of the issues, endangering the witness, and the injection of cumulative or collateral evidence. *Id.*

The proponent of the challenged evidence generally has the burden of establishing the evidence's admissibility by a preponderance of the evidence.

14

*White v. State*, 549 S.W.3d 146, 151–52 (Tex. Crim. App. 2018); *Vinson v. State*, 252 S.W.3d 336, 340 n.14 (Tex. Crim. App. 2008). Therefore, appellant had the burden to demonstrate the admissibility of the evidence related to the Oklahoma high school sexual assault allegation despite Rule 412's general rule of exclusion. Under the "motive or bias" exception, appellant had to establish that the proffered evidence about the Oklahoma high school sexual assault allegation was probative on the issue of the complainant's motive or bias to make a false allegation of sexual assault against appellant, and that the evidence was more probative than prejudicial. *See Montgomery v. State*, 415 S.W.3d 580, 583 (Tex. App.—Amarillo 2013, pet. ref'd). Under the constitutionally required exception, it was appellant's burden to establish that the Confrontation Clause required the admission of the Oklahoma high school sexual assault evidence and that the evidence was more probative than unfairly prejudicial. *See Henley*, 493 S.W.3d at 95 ("In determining whether evidence must be admitted under the Confrontation Clause, the trial court must balance the defendant's right to cross-examine and the probative value of the proffered evidence against the risk factors associated with the admission of the evidence."); *Lopez*, 18 S.W.3d at 225–26 (holding Confrontation Clause did not require admission of evidence of prior sexual assault accusation because evidence had no probative value where appellant did not establish prior accusation was false).

## II. The trial court did not abuse its discretion when it excluded evidence regarding a prior sexual assault allegation of the complainant.

We conclude that the trial court did not abuse its discretion when it excluded the proffered Oklahoma high school sexual assault evidence because appellant did not meet his burden to demonstrate the evidence was admissible under either Rule 412 or the Confrontation Clause. Even if we assume for purposes of argument that the complainant mentioning the prior sexual assault in a diary maintained as part of

15

the counseling she received qualifies as an allegation of sexual assault, appellant has not demonstrated the allegation was false.  Throughout her bill-of-exception testimony, the complainant maintained that she had been raped while she was in high school in Oklahoma.  That the complainant, who was thirteen or fourteen years old when the incident allegedly occurred, may have been mistaken about when the foreign exchange student left the country, had not removed the foreign exchange student as a Facebook friend, and may have told her counselor that the Oklahoma high school incident was an attempted sexual assault, do not establish that the complainant made a false allegation of sexual assault.  *See Montgomery*, 415 S.W.3d at 584 n.2 (excluding witness's testimony regarding the alleged victim's prior sexual activity even though it appeared to conflict with the victim's own trial testimony regarding her prior sexual activity).  Without proof that the sexual-assault allegation against the foreign exchange student was false, the trial court reasonably could have concluded that the evidence had little or no probative value and what there was, was outweighed by the danger of unfair prejudice.  *See Lopez*, 18 S.W.3d at 226 ("Without proof that the prior accusation was false or that the two accusations were similar, the evidence fails to have any probative value in impeaching Paul's credibility in this case.").

Additionally, the proffered evidence does not reveal that the two incidents were similar.  As a result, there is no logical connection between the two events that would reveal a bias against appellant or a motive to lie on the part of the complainant.  *Id.*; *Woods v. State*, 301 S.W.3d 327, 335 (Tex. App.—Houston [14th Dist.] 2009, no pet.) ("There is no evidence that the prior assault was similar or related to the instant crime warranting admissibility."); *cf. Billodeau v. State*, 277 S.W.3d 34, 42–3 (Tex. Crim. App. 2009) (holding trial court abused discretion when it excluded evidence that complainant had made false sexual assault

allegations against others because such evidence revealed a possible motive for accusing defendant of sexual molestation). Thus, the trial court once again reasonably could have decided that the probative value of the evidence was outweighed by the danger of unfair prejudice, which includes prejudice to the complainant. *See Montgomery*, 415 S.W.3d at 584 (noting that disclosure of prior sexual conduct would have subjected complainant to ridicule and humiliation).

Having determined that the trial court did not abuse its discretion when it excluded the proffered evidence, we overrule appellant's single issue on appeal.

## CONCLUSION

Having overruled appellant's only issue on appeal, we affirm the judgment of the trial court.


/s/    Jerry Zimmerer
Justice


Panel consists of Chief Justice Frost and Justices Zimmerer and Hassan.

Do Not Publish — TEX. R. APP. P. 47.2(b).